**F I L E D**

PUBLISH

**October 3, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DEANDRE J. GREGOIRE,

    Defendant - Appellant.

No. 04-4254
(D.C. No. 02-CR-756-DB)
(D. Utah)

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 2:02-CR-756-DB)**

---

Paul M. Warner, United States Attorney, and Michael Kennedy, Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

Bryant K. Calloway, Irvine, California, and Samuel P. Chiara, Price, Utah, for Defendant-Appellant.

---

Before **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.[*]

---

**KELLY**, Circuit Judge.

---

[*] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

Defendant-Appellant Deandre J. Gregoire appeals from the denial of his motion to suppress evidence obtained from his vehicle during a traffic stop. See United States v. Gregoire, No. 2:02 CR 756 DB, 2003 WL 23355738, Memo. Op. & Order (D. Utah Dec. 2, 2003). Mr. Gregoire pleaded guilty to possession with intent to distribute five kilograms of cocaine, 21 U.S.C. § 841(a)(1) & (b)(1)(A), and was sentenced to ten years imprisonment and five years supervised release. Pursuant to Fed. R. Civ. P. 11(a)(2), he reserved his right to appeal the denial of his suppression motion. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

Background

On Sunday, November 17, 2002, at approximately 8:45 a.m., Utah Highway Patrol Officer Steve Salas stopped Mr. Gregoire's vehicle for failing to signal that he was merging onto I-70 from the entrance ramp in violation of Utah Code Ann. § 41-6-69(1) (2004).[1] The trooper observed that the rear seat of the van was

---

[1] The statute provides:

(1)(a) A person may not turn a vehicle or move right or left upon a roadway or change lanes until the movement can be made with reasonable safety and an appropriate signal has been given.
(b) A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last three seconds preceding the

folded down and had been made into a sleeping area.

Pursuant to the trooper's request, Mr. Gregoire produced an Ohio driver's license. When Mr. Gregoire was told the reason for the stop, he stated that he had signaled. The trooper then asked Mr. Gregoire where he was headed, and Mr. Gregoire explained that he was returning from Las Vegas after visiting his grandfather who had a minor stroke, but then said that he was returning from visiting friends in Las Vegas where he had lost money. The trooper requested the vehicle's registration and while Mr. Gregoire was looking for it, the trooper asked whether Mr. Gregoire had just purchased the van and what Mr. Gregoire did for a living. Mr. Gregoire told the trooper that he had, and was a student. The two then had a conversation about Mr. Gregoire's fear of law enforcement troopers. Trooper Salas noticed a strong odor of air freshener. The trooper asked Mr. Gregoire about it, and Mr. Gregoire became a little bit flustered. Mr. Gregoire explained that he did not know the brand, and did not have it with him because the air freshener had been sprayed in the vehicle.

After Mr. Gregoire's operator's license and registration were verified, they were returned. The trooper then issued Mr. Gregoire a warning, explaining that Mr. Gregoire had no further obligation to contact a court or pay a fine, but he

---

beginning of the turn or change.

Utah Code Ann. § 41-6-69(1) (repealed and renumbered as § 41-6a-804).

should be sure to signal when coming on or off the freeway. The district court found that at this point, Mr. Gregoire was free to leave, but instead engaged the trooper in further conversation about the violation.

After explaining that he signals every time he turns, Mr. Gregoire exited the vehicle and confirmed that his turn signal was working. The trooper explained to Mr. Gregoire that he was stopped for failing to signal that he was entering the highway, not for failing to signal a turn and that he was not given a ticket, just a reminder to use his signal. The trooper then asked if he could ask Mr. Gregoire a few questions about his trip and Mr. Gregoire responded "Go ahead." Aplt. App. 17. The trooper then asked Mr. Gregoire when he went out to Nevada. Mr. Gregoire stated that he left Friday, and that he received a ticket during his trip for going 90, and that he couldn't have been going that fast. The trooper requested a copy of the citation and noticed it was from Barstow, California. When asked about this part of his trip, Mr. Gregoire explained that he went to Barstow, which he insisted is in Nevada, to shop at certain outlet stores but did not purchase anything because he lacked enough money.

The trooper next inquired about whom he stayed with on Friday night, but Mr. Gregoire could provide only a first name of a friend. In the course of inquiring, the trooper asked where Mr. Gregoire worked, what he was studying, and why his girlfriend didn't accompany him. Concerning the friend he stayed

- 4 -

with, the trooper asked where the friend lived, whether in a house or apartment, whether he was married, and what casinos he frequented. Mr. Gregoire then told the trooper that he lost it all in Las Vegas and had to go to his credit card and there was a $300 limit. The trooper asked what Mr. Gregoire played and when he had to be back at work.

The trooper testified that he was suspicious of the many discrepancies in Mr. Gregoire's account of his travels, and this led him next to ask a series of questions about whether there was anything illegal in the vehicle. During the questioning, Mr. Gregoire indicated that the trooper could search the vehicle. See Aplt. App. 22 (Q: "Do you have anything illegal in your van today, guy? A: "No, you can empty it if you want to."). Later in the questioning, the trooper sought and obtained Mr. Gregoire's consent to search the vehicle.

The trooper noticed that the bolts fastening the rear seat appeared to have been removed several times, the carpet had been installed loosely and was buckled, and had pulled away from molding that normally covers it. From his training and experience, the trooper testified that he was aware that the vehicle had a gap between the floor and bottom of the vehicle. At this point, he advised Mr. Gregoire that the search was going to take longer. Thereafter, the trooper drilled two small holes in the floor, but did not discover the contraband until he chipped away some undercoat that covered the bottom of the compartment. He

then found a non-factory weld that held a piece of sheet metal from the vehicle's outside running board to the inner frame rail of the van. After prying the sheet metal, the trooper found a black square package containing the contraband.

Discussion

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government, accepting the district court's factual findings unless clearly erroneous. United States v. Cantu, 405 F.3d 1173, 1176 (10th Cir. 2005). Fourth amendment reasonableness is reviewed de novo. Id. On appeal, Mr. Gregoire argues that (1) the trooper's stop of his vehicle and resultant seizure of his person was not justified at its inception because Utah law does not require a driver to signal in these circumstances, (2) the trooper's detention of Mr. Gregoire was not reasonably related to the circumstances which may have justified the detention initially because (a) the trooper prolonged the detention in the absence of reasonable suspicion, (b) Mr. Gregoire did not voluntarily consent to additional questioning or a prolonged detention, and (c) the trooper lacked an objectively reasonable belief that Mr. Gregoire committed a traffic violation, and (d) the stop cannot be justified under the good faith exception to the exclusionary rule. He further argues that (3) the warrantless search of his vehicle required suppression of the evidence obtained

because (a) his consent to search the vehicle was not voluntary in fact, (b) there was an insufficient break between the illegal stop and his consent to search such that suppression is required, (c) the trooper's search of the vehicle exceeded the scope of his consent, and (d) the discovery of the contraband occurred after Mr. Gregoire had withdrawn his consent to search.

*1. Was the Trooper's Stop Justified at Its Inception?*

Under the Fourth Amendment, the constitutionality of a traffic stop is analyzed in the same manner as investigative detentions. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir.1995) (en banc). The stop must be justified at its inception and reasonably related in scope to the circumstances justifying it. Id. An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop. Id. at 787; see also United States v. Parker, 72 F.3d 1444, 1449 (10th Cir. 1995) (drifting out of travel lane into emergency lane and failing to signal provided reasonable suspicion). Here, the issue is whether Utah law requires a driver merging to signal in these circumstances.

Mr. Gregoire was stopped for not signaling upon entering from the on ramp onto the travel lane. Aplt. App. 86; 123-124. He was not stopped for attempting to change lanes; he merely merged from the on-ramp onto the right travel lane of I-70. Id. at 41, 86. The district court observed that the on-ramp and the travel

- 7 -

lane are separated by a solid line until a move to the left is required at which point the solid line becomes a dotted line. Id. at 124.

The district court determined that the statute required a signal in three instances: when turning, when moving right or left on a roadway, and when changing lanes. Aplt. App. 130; see also State v. Lopez, 873 P.2d 1127, 1134 n.1 (Utah 1994) (turning without signaling violates statute). It concluded that the merging in these circumstances constituted moving left onto a roadway, thereby requiring a signal. Aplt. App. 130. The merge in this case did not constitute changing lanes because the two lanes become one and the statute's reference to right or left movement more specifically described this situation. Id. at 131. "One cannot merge onto a roadway without moving to the left or the right." Id. It rejected Mr. Gregoire's position as inconsistent with the plain meaning of the statute and without support in the law.

While the former may be true, the latter is not. In United States v. Powell, 929 F.2d 1190 (7th Cir. 1991), a Seventh Circuit panel determined that a Utah stop predicated on a failure to signal when merging was invalid and could not constitute probable cause for a stop. Id. at 1194. The panel determined that the same Utah statute was ambiguous as applied because it was not clear whether a highway on-ramp qualified as a lane considered part of the roadway. Id. at 1193. The panel looked to the Utah Driver Handbook for guidance. Although the

handbook instructed drivers to signal at intersections, its instructions and a diagram did not so instruct when merging. Id. at 1193-94. That is still the case. See Utah Driver Handbook at 12-14, 39-40 (Rev. 2004 Ed.), available at http://driverlicense.utah.gov/pdf/dlhandbk.pdf (last visited Sept. 19, 2005). The panel also reasoned that such a signal is not necessary to notify other drivers of a lane change or turn because (1) other drivers know that the only reason to use an on-ramp is to merge, (2) such a signal could not be seen from the more distant, differently elevated, and non-parallel portions of the on-ramp, even with the requirement for three seconds advance signaling, Utah Stat. Ann. 41-6-69(1)(b). Powell, 929 F.2d at 1194.

Mr. Gregoire makes similar arguments, but also points out that the signaling statute never mentions merging. He suggests that "merging involves pointedly moving a vehicle *straight* into a lane that, along with one or more other lanes, transitions into a single lane." Aplt. Br. at 8 (emphasis in original). He relies upon Utah Code Ann. § 41-6-75.5 (2004)[2] (repealed and renumbered as Utah Code Ann. § 41-6a-903(3)), which requires one to yield when merging, and

---

[2] "The operator of a vehicle traveling in a lane that is about to merge into a continuing lane, shall yield the right-of-way to all vehicles traveling in the continuing lane and which are so close as to be an immediate hazard."

Utah Code. Ann. § 41-6-75.5.

suggests that because this section does not prescribe the use of a signal, a signal is not required. This argument is not persuasive because § 41-6-75.5 deals with right-of-way, so it is not surprising that signaling is not mentioned. Mr. Gregoire also analogizes merging in these circumstances "to driving around a bend or a curve; while it is necessary for the driver to steer his vehicle to accommodate the architecture of the lane, signaling is not necessary." Aplt. Br. at 9. This analogy is not completely apt because a driver on an on-ramp must negotiate a more complex situation. First, the driver must proceed down the ramp and cannot cross the solid white line and enter into the gore area.[3] Rather, he must wait for the dotted line indicating it is permissible to merge. Second, the driver must stop at the end of the on-ramp if no openings in oncoming traffic are possible. Though the driver's ultimate objective is to merge, signaling serves as a reminder of the driver's presence and intention.

We agree with the district court that the act of merging from the on-ramp directly onto the right lane of the highway does not constitute a turn or a lane

---

[3] A gore is an area of land where two roadways diverge or converge. It is defined in Utah as:

> the area delineated by two solid white lines that is between a continuing lane of a through roadway and a lane used to enter or exit the continuing lane including similar areas between merging or splitting highways.

Utah Stat. Ann. § 41-6a-102(18).

change under the statute. Aplt. App. 131. If it were, a signal would have to be given continuously for the last three seconds before the merge. Of course, a vehicle cannot merge prior to the dotted line; it cannot cross into the gore area. See Utah Code Ann. § 41-6a-713(1)(a) (prohibiting operating a vehicle over, across or within a gore area). Though the issue is close, we believe that the district court's factual findings that a successful merge with this on-ramp requires a move to the left to enter the travel lane is dispositive. Aplt. App. 124 ("At this point [where the solid line of the on-ramp becomes a dotted line], in order to properly execute a merge, a move to the left is required to enter the travel lane of I-70."). The district court's factual findings must be upheld unless clearly erroneous. See United States v. Santos, 403 F.3d 1120, 1124 (10th Cir. 2005). It was in the best position to confirm the situation described by the trooper in the suppression hearing. On its own motion, it conducted a site visit of where the stop occurred (with all parties and the trooper present).

Unlike the Seventh Circuit, we do not find the statute ambiguous as applied. The travel lane of I-70 (and probably the on-ramp of Exit 158) is a roadway to which the statute would apply. See Utah Code Ann. § 41-6a-102(51)(a) (defining "roadway" as "that portion of highway improved, designed, or ordinarily used for vehicular travel"). And a merge in the situation found by the district court requires a move to the left for which a signal is required.

- 11 -

Although the government argues that merging is the only possible application of the "move right or left" portion of the statute, other applications are possible. A vehicle may pull off the roadway onto the shoulder or enter the roadway from the shoulder. See State v. Preece, 971 P.2d 1, 5 (Utah 1998). This situation also involves a "move right or left" where the statute would apply and requires signaling.

The district court initially expressed skepticism at the suppression hearing that the statute required signaling given the obvious intention of a driver in the merge lane. However, the government suggested (and the trooper agreed) that the signal lights make the merging vehicle more visible to upcoming traffic and clearly express the driver's intentions. Aplt. App. 88. Although the Seventh Circuit suggested that the signal might not be seen were the on-ramp at a different elevation than the highway and not parallel, that does not describe all on-ramps. Moreover, at the point where a merge is permissible and just prior, visibility to oncoming traffic should be possible. Regardless, because the meaning of the statute is clear in these circumstances, we need not debate the wisdom of the requirement, other than to note a rational purpose. Though it is interesting that the Utah Driver Handbook omits the requirement to signal--it acknowledges that the statutes govern. Utah Driver Handbook, intro. ("This handbook condenses or paraphrases the actual language of the Utah Code. Officers of the courts are

guided by the full text and exact language of the law, rather than the Utah Driver Handbook.").

Having determined that the statute applies, we conclude that on the basis of his observations, the trooper had reasonable suspicion, indeed probable cause, to stop Mr. Gregoire. See Whren v. United States, 517 U.S. 806, 817-819 (1996); Del. v. Prouse, 440 U.S. 648, 661 (1979). Although Mr. Gregoire reminds us that the trooper was part of a Criminal Interdiction Team focusing on drug enforcement, stolen vehicles, and driving under the influence, when he stopped Mr. Gregoire, the subjective motivation of the trooper is not pertinent given the observed violation. See Whren, 517 U.S. at 818. In his reply brief, Mr. Gregoire alleges that he was pulled over and detained because he was an African-American male driving an older model van with out-of-state license plates that fit the trooper's profile of a person in the business of narcotics. Aplt. Reply Br. at 10. That specific claim was not developed in the suppression hearing nor in the opening brief and is considered waived. And although Mr. Gregoire maintained that he indeed signaled, the district court credited the sworn testimony of the trooper to the contrary. Aplt. App. 124 n.3

*2. Was the Trooper's Detention Reasonably Related in Scope to the Circumstances Justifying the Initial Detention?*

In a routine traffic stop, a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then

issue any warning or citation. United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). Once those tasks are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in criminal activity or the driver consents to additional questioning. Id. A consensual encounter is voluntary cooperation with law enforcement in response to non-coercive questioning. United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996). The issue is whether law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter. Id.

Mr. Gregoire first argues that no reasonable suspicion existed for detaining him once the warning had been issued. Once that was done, Mr. Gregoire tells us that he only wanted to discuss the warning. He argues that the trooper's true intentions of drug interdiction are evident from the trooper's refusal to accompany him to the rear of the vehicle where he confirmed that his turn signal was operational. Instead, the trooper continued to peer into the vehicle from the passenger side of the vehicle. The short answer to this argument is that Mr. Gregoire was not detained after the warning. He consented to additional questioning.

3. *Did Mr. Gregoire Voluntarily Consent to Further Questioning?*

Mr. Gregoire argues that he did not consent voluntarily to additional

- 14 -

questioning or a prolonged detention. The government bears the burden of proving voluntary consent based on the totality of the circumstances. United States v. Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir.1993). Mr. Gregoire suggests that the trooper never informed him that the additional questioning would relate to matters outside the scope of the traffic citation, and that the trooper never told him he could decline to answer questions. He argues that most civilians regard law enforcement officers as powerful figures of authority and are unaware of their right to decline to answer questions without repercussions. Be that as it may, there is no requirement that law enforcement advise as to the precise subject of the additional questioning or that a citizen may terminate the encounter, though this latter factor may be considered in a totality of the circumstances approach to voluntariness. United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005). Here, the trooper's request to ask additional questions came in full daylight on the open road, with no physical restraint or intimidation of Mr. Gregoire. Although Mr. Gregoire suggests that the trooper was in very close proximity to him, the district court's finding of voluntary consent to additional questioning based on the totality of the circumstances is not clearly erroneous.

Mr. Gregoire next argues that the trooper lacked an objectively reasonable belief that Mr. Gregoire committed a traffic violation. This argument is

predicated upon a holding that merging without signaling under Utah law is not a violation. Having held to the contrary, we need not address it. Likewise, Mr. Gregoire's argument that the stop cannot be justified under the good faith exception to the exclusionary rule need not be addressed.

*4. Was the Search of Mr. Gregoire's Vehicle Based Upon Voluntary Consent and Within the Scope of that Consent?*

The district court found that Mr. Gregoire twice gave his consent to search the vehicle, once when he invited the trooper to search it, and once at the request of the trooper. It noted that the search took place in a public place in daylight, with no restraint or intimidation of Mr. Gregoire. Aplt. App. 127-28. These findings are amply supported by the record. Mr. Gregoire has framed his argument in terms of a holding that the stop was unlawful, nonetheless, we reject the suggestion that the trooper's failure to advise him that he was free to leave, or that he could refuse consent to search, rendered the consent involuntary. Given our holding that the events which preceded the search were lawful, it is unnecessary to address Mr. Gregoire's argument that there was an insufficient break between a purportedly illegal stop and his consent to search such that suppression is required.

Mr. Gregoire next argues that the trooper's search of the vehicle exceeded the scope of his consent. The scope of consent is a fact question based upon what a reasonable person would have understood under the circumstances.

Rosborough, 366 F.3d at 1150. General permission to search a vehicle usually extends to its entirety, absent objection or limitation by the driver. See United States v. McRae, 81 F.3d 1528, 1538 (1996). However, a search can be so invasive or destructive as to exceed the bounds of consent, even absent objection. United States v. Osage, 235 F.3d 518, 520 (10th Cir. 2000).

Mr. Gregoire points to the transcript of the stop and the trooper's assurance that the search would be quick. Aplt. App. 22. He then argues that a reasonable person would not presume a search lasting 45 minutes, let alone one that began with the drilling of two holes in the interior and concluded with a large screwdriver used to pry away a portion of the undercarriage of the vehicle to reveal the contraband. Aplt. Br. at 23-24. The district court found that Mr. Gregoire never limited that scope of the search of the vehicle, or asked the trooper to stop searching the vehicle. Aplt. App. 127, 138.

We approach this issue from the perspective of what a reasonable innocent person would perceive. See Fla. v. Bostick, 501 U.S. 429, 438 (1991). Here, the trooper questioned Mr. Gregoire about whether the vehicle contained anything illegal, including guns, marijuana, cocaine, heroin, or illegal drugs, prior to obtaining his consent to search. Aplt. App. 22. A reasonable person would expect more than a cursory view of the vehicle if the trooper were looking for contraband. See Fla. v. Jimeno, 500 U.S. 248, 251 (1991) (permission to search

encompasses permission to search containers in car); <u>United States v. Pena</u>, 663 F.2d 1019, 1026 (10th Cir. 1981) (permission to search contemplates a thorough search; removal of ashtray and air vent cover in side of door was within scope of consent). Once the trooper detected what appeared to be a false compartment in the vehicle, he advised Mr. Gregoire that he suspected that something illegal (a hidden controlled substance) was in the van and the search was going to take longer. Aplt. App. 23-24. A reasonable innocent person advised of a strong suspicion of a false compartment in the vehicle could very well expect a more invasive search to ascertain the contents of that compartment. We have upheld similar searches involving the partial dismantling of a vehicle pursuant to general consent when the defendant did not object. <u>See</u> <u>United States v. Marquez</u>, 337 F.3d 1203, 1206, 1208-09 (10th Cir. 2003) (prying nailed-down plywood covering from RV bench, and unscrewing second plywood covering); <u>McRae</u>, 81 F.3d at 1537 (lifting of trunk carpet held by fastener); <u>United States v. Santurio</u>, 29 F.3d 550, 553 (10th Cir. 1994) (removing screws from strip holding down carpet which revealed false compartment in van); <u>United States v. Espinosa</u>, 782 F.2d 888, 892 (10th Cir. 1986) (lifting up loose part of quarter panel).

Mr. Gregoire argues that he in fact did withdraw his consent to search and unequivocally objected to the search and his detention. The trooper testified to the contrary. Aplt. App. 60. Mr. Gregoire points to the transcript of the stop

where he stated "I [sic] planning to be home" and "Isn't that illegal. You're not supposed to search the car." Id. at 23. These comments came after the trooper advised Mr. Gregoire of his suspicion that the vehicle contained a hidden controlled substance and occurred several minutes before the drilling and prying. The trooper responded to these comments by telling Mr. Gregoire "we're going to be a few more minutes." Id. at 23. Apparently, the trooper did not interpret Mr. Gregoire's comments as a request to stop.

We think the district court could arrive at a finding that consent was not withdrawn or limited by these somewhat ambiguous statements, particularly when placed in the context of Mr. Gregoire's surrounding statements attempting to exculpate himself. Though it might be possible to arrive at a contrary finding, given two permissible views of the evidence, the district court's findings are not clearly erroneous. The district court's decision on the motion to suppress follows from its carefully considered factual findings. Accordingly, the judgment and sentence must be

AFFIRMED.