**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SAMUEL FLORES,

Defendant-Appellant.

No. 05-2146

(D.C. No. CR-04-1657 JC)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, **SEYMOUR**, and **BRISCOE**, Circuit Judges.

Defendant Samuel Flores entered a conditional plea of guilty to conspiring to possess, as well as actually possessing, more than 100 kilograms of marijuana with the intent to distribute, and was sentenced to concurrent terms of imprisonment of thirty months. Flores now appeals, challenging the district court's denial of his motion to suppress his post-arrest statements. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

*Factual background*

On August 1, 2004, United States Border Patrol Agent Jeffrey King was on duty in the so-called "bootheel area" of southwestern New Mexico. The bootheel area, according to Agent King, is a desolate area with little traffic, other than that of local ranchers. A single, two-lane highway, New Mexico State Highway 81, runs north from the Antelope Wells Port of Entry, which is located at the United States/Mexico border, to the small town of Hachita, New Mexico. Another two-lane highway, New Mexico State Highway 9, runs through Hachita. A driver heading in a northwesterly direction on Highway 9 out of Hachita can take yet another two-lane highway, New Mexico State Highway 146, north to Interstate 10, which runs west to Phoenix, Arizona, and east to El Paso, Texas. According to Agent King, many people attempting to smuggle aliens and narcotics use this route to get to Interstate 10.

In the late afternoon hours on August 1, 2004, Agent King was driving west on a county road that intersected with Highway 81. As he approached Highway 81, Agent King observed two vehicles driving north on Highway 81. The first car was a Pontiac Sunfire with Arizona license plates. The second car was a Chevrolet Malibu, also with Arizona license plates. Agent King noticed that the back end of the Pontiac was "very dirty," ROA, Vol. IV at 6, leading him to "wonder[] where [it] had been." Id. at 7. Agent King pulled in behind the two vehicles and began driving north on Highway 81. As he did so, he first called his El Paso office and requested a vehicle registration check, a

-2-

stolen vehicle check, and a 72-hour lane check[1] on the Chevrolet. All of those checks came back negative. Agent King then passed the Chevrolet and pulled in behind the Pontiac. Upon being passed, the Chevrolet sped up and maintained a close position behind Agent King's vehicle. Agent King called his El Paso office and requested a vehicle registration check, a stolen vehicle check, and a 72-hour lane check on the Pontiac. As with the Chevrolet, all of those checks came back negative. By the time the checks came back, all three vehicles had arrived in Hachita and turned west on Highway 9. Based upon all the circumstances, Agent King decided to pull the Pontiac over and perform an immigration check.

When Agent King activated the emergency equipment on his vehicle, the Pontiac turned on its turn signal and started slowing down. Before the Pontiac stopped, however, the Chevrolet passed Agent King and pulled in between his vehicle and the Pontiac. After staying in that position for approximately ten to twenty-five seconds, the Chevrolet then passed the Pontiac. Both the Pontiac and the Chevrolet then stopped by the side of the road. The driver of the Pontiac, Martha Montano, got out of the vehicle, as did the two adult occupants of the Chevrolet, Michael Larez, who had been driving the Chevrolet, and defendant Flores, who had been riding in the front passenger seat of the Chevrolet. Larez and Flores began yelling at Montano "that they [Larez and Flores] had

_____

[1] According to Agent King, a 72-hour lane check indicates whether a vehicle passed through an official border checkpoint within the past 72 hours.

the babies in the back [of the Chevrolet] and the babies were fine."[2] Id. at 10. Agent King instructed Larez and Flores to get back in the Chevrolet, which they did. Id.

Agent King proceeded to perform an immigration check on Montano and her male passenger. As Agent King was asking them about their citizenship, he observed, through the rear driver's side window of the Pontiac, a blanket in the back seat that appeared to be covering something up. Agent King asked Montano if she would mind him taking a look in the back of the car. Montano said she didn't mind, and proceeded to yell to Larez and Flores, "How do you open the back?" Id. at 11. Agent King told Montano that she didn't need to ask Larez and Flores how to open the trunk, because all he wanted to know was if he could look in the back seat. Montano proceeded to open the back door of the Pontiac. When she did so, Agent King observed the sides of burlap bundles underneath the blanket. Agent King had seen similar bundles before, and believed them to contain marijuana.

Agent King instructed Montano to place her hands on top of the Pontiac, and instructed the passenger to get out of the vehicle and put his hands on the hood. Although Montano and the passenger initially complied, they both yelled at Larez and Flores "go, go, go" in Spanish. Larez and Flores proceeded to speed away in the Chevrolet. Agent King advised Montano and her passenger that they were under arrest for transporting marijuana. As Agent King was reading Montano and her passenger their Miranda rights,

_____

[2] Two young children were ultimately determined to be riding in the back seat of the Chevrolet.

the passenger began to get back inside the Pontiac. Although Agent King instructed him to stop and place his hands back on the car, the passenger ignored Agent King. After the passenger sat down in the passenger seat of the Pontiac, Montano sat down in the driver's seat of the Pontiac and attempted to close the door. Agent King placed his hands on the inside of the driver's side door, preventing Montano from closing it. The passenger began yelling at Montano to shut the door and start the car. Concerned for his own safety, Agent King removed his hands from the driver's side door. Montano proceeded to shut the door and then drove off, heading west on Highway 9. Agent King called his supervisor and informed him of what had occurred, and then got in his car and followed after the Pontiac.

Approximately four or five miles west of where the initial stop had occurred, Agent King observed the Pontiac by the side of the road. Agent King also observed Montano and her passenger running away from the Pontiac in a northerly direction through the desert. Agent King stayed with the Pontiac until another agent arrived, and then he chased after Montano and her passenger on foot. Both Montano and her passenger were eventually caught. The Pontiac was seized and twelve bundles of marijuana weighing 241.6 pounds were found inside it.

Patrick Green, a deputy with the Hidalgo County Sheriff's Department, was on duty that afternoon and heard, over his radio, a call for assistance from a Border Patrol unit. On Highway 9, Green observed the Chevrolet that had been described in the call for assistance. Green clocked the Chevrolet driving 78 miles per hour in a 55 miles per hour

zone. Green proceeded to stop the Chevrolet. Green wrote Larez two tickets, one for speeding and another for having no driver's license. Green proceeded to detain both Larez and Flores due to their connection with the Pontiac. Larez and Flores were subsequently placed under arrest. Flores agreed to waive his Miranda rights and speak with Border Patrol agents (as did Montano). Flores told Border Patrol agents that "Larez . . . made . . . arrangements" for the group to "meet an unidentified man at a gas station" in Columbus, New Mexico, and that from there "the man . . . t[ook] them to a location south of Hachita . . . ." Id. at 47-48. There, Flores indicated, the unidentified man took Montano into the desert, loaded up the bundles of marijuana into her car, and then walked off into the desert. Montano then drove the Pontiac back to Highway 81, met up with Larez and Flores in the Chevrolet, and the group proceeded to drive northward on Highway 81.

*Procedural background*

On August 19, 2004, a federal grand jury returned a two-count indictment against Flores, Montano, and Larez. Count 1 of the indictment charged these three defendants with conspiring to possess with intent to distribute 100 kilograms and more of marijuana, in violation of 21 U.S.C. § 846. Count 2 of the indictment charged the three defendants with possessing with the intent to distribute 100 kilograms and more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

Flores moved to suppress "any statements and physical evidence seized as a result of [his] illegal detention and arrest on August 1, 2004." ROA, Vol. I, Doc. 21 at 1. In

support of his motion, Flores argued that, "[p]rior to initiating the emergency equipment, [Agent King] did not have sufficient facts to support a reasonable suspicion that the vehicles were involved in illegal activity." Id. at 3. In other words, Flores argued that "he was illegally stopped on Highway 81 by [Agent King]." Id. at 6. The district court conducted an evidentiary hearing on Flores' motion to suppress on December 2, 2004. During the hearing, Flores' counsel admitted that Flores, who was a passenger in the Chevrolet, lacked a "possessory interest[]" in the Pontiac, and thus noted he was seeking simply to suppress Flores' statements. ROA, Vol. IV at 53. At the conclusion of the hearing, the district court denied Flores' motion.

Following the denial of his motion to suppress, Flores entered into a plea agreement with the government. Under the terms of that agreement, Flores agreed to waive his rights and plead guilty to the two counts contained in the indictment. However, Flores specifically reserved the right to appeal the district court's denial of his motion to suppress. On May 3, 2005, the district court sentenced Flores to a thirty-month term of imprisonment on each count, with the terms of imprisonment to run concurrently.

## II.

On appeal, Flores challenges the district court's denial of his motion to suppress. "When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government, accepting the district court's factual findings unless clearly erroneous." United States v. Gregoire, 425 F.3d 872, 875 (10th Cir. 2005). "Fourth amendment reasonableness is reviewed de novo." Id.

Flores argues that Agent King lacked reasonable suspicion to stop either the Chevrolet or the Pontiac. As noted by the government, however, there are two critical flaws in Flores' appeal. First, it is clear that he lacks standing to challenge Agent King's stop of the Pontiac. Not only is the record devoid of any evidence indicating that Flores had a possessory or property interest in the Pontiac, Flores' counsel admitted as much during the hearing on the motion to suppress. Second, the district court did not find, nor does the evidence presented during the suppression hearing support a finding, that Agent King stopped the Chevrolet in which Flores was a passenger. Indeed, the evidence establishes that Agent King stopped only the Pontiac, and that Larez voluntarily stopped the Chevrolet after the Pontiac was stopped. Thus, as noted by Agent King at the evidentiary hearing, Larez and Flores were free to leave up until the time that Agent King observed the marijuana bundles in the back seat of the Pontiac.

Flores does not appear to be challenging the validity of Deputy Green's later stop of the Chevrolet, nor does the record support any such challenge. It is clear that Deputy Green had two valid reasons for stopping the Chevrolet. First, the record indicates that Deputy Green, having clocked the Chevrolet driving 78 miles per hour in a 55 miles per hour zone, had reasonable suspicion that the driver of the Chevrolet violated applicable traffic regulations. See United States v. Alvarado, 430 F.3d 1305, 1308 (10th Cir. 2005) (discussing reasonableness of the initial stop of a vehicle). Second, and more importantly, it is clear that Deputy Green, based upon the information relayed to him over the radio, had probable cause to believe that the occupants of the Chevrolet were involved

in marijuana trafficking in connection with the occupants of the Pontiac that had been stopped by Agent King, and that the occupants of the Chevrolet were attempting to evade arrest.

Finally, to the extent Flores is challenging his seizure and arrest by Deputy Green, the record fully supports the validity of those actions. For the reasons already discussed, we conclude it was reasonable for Deputy Green to not only stop the Chevrolet, but to seize it and its occupants. See Delaware v. Prouse, 440 U.S. 648, 654-55 & n.10 (1979).

AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge
