**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 10, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SAMUEL L. JETER, a/k/a Samuel
Lamont Jeter, a/k/a Lil Sam "Rated R";
BRIAN PINKNEY, a/k/a Brian Lamont
Pinkney, a/k/a B-Love "Rated R,"

    Defendants-Appellants.

Nos. 05-4186 and 05-4188

(D.C. No. 2:04-CR-000624 PGC)

(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **BALDOCK,** and **KELLY**, Circuit Judges.[**]

A Utah State Trooper discovered fifteen kilograms of cocaine in a hidden

compartment of Defendants' vehicle.  Following denial of their motion to suppress,

Defendants reserved their right to appeal by entering conditional pleas of guilty to

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.

possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  See

Fed. R. Crim. P. 11(a)(2).  On appeal, Defendants claim their detention exceeded the

permissible scope of the traffic stop, and thus tainted their subsequent consent to search.

Because the historical facts are undisputed, we concern ourselves only with the district

court's conclusion that reasonable suspicion supported Defendants' continuing detention

once the purpose of the initial stop had been satisfied.  Our review is de novo.  See United

States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006).  We affirm.

## I.

Utah State Trooper Steve Salas is a veteran member of the state's criminal

interdiction unit.  Around 9:35 a.m. on September 15, 2004, Trooper Salas stopped a Ford

Expedition along Interstate 70 for traveling 10 mph over the posted speed limit.

Defendant Samuel Jeter was the driver.  Defendant Brian Pinkney was his passenger.  As

Trooper Salas approached, he noticed the vehicle's two side rear windows were open

approximately two inches.  When Pinkney rolled down the front passenger side window,

Trooper Salas noted "an overwhelmingly strong odor of air freshener coming from inside

the vehicle."  The trooper observed two air fresheners hanging from the rearview mirror

and another hanging behind the driver's seat.  On the ceiling behind the passenger's seat,

the trooper observed another type of air freshener clipped to a vent.  On the front dash,

Trooper Salas saw several small air fresheners placed inside the vents.  At the suppression

hearing, Trooper Salas testified:

2

[T]he odor was so strong that I assumed it would almost make somebody nauseous being inside the vehicle with that many air fresheners. . . . It's not consistent to have multiple air fresheners that are different flavors. . . . Because of the number of air fresheners and because the back windows were open, I was assuming that they were trying to get some type of odor out of the vehicle. Based on my training and experience, I believed they were trying to cover an odor, that's why they had the number of air fresheners they had.

Trooper Salas asked Defendant Jeter for his license, registration, and proof of insurance. Jeter produced his driver's license. The two men informed the trooper they were returning to Ohio from vacation in Las Vegas. Defendant Pinkney explained the vehicle belonged to him and his fiancee. He produced an insurance card in his name and a registration card in the name of Teanna Floyd. When Pinkney retrieved the vehicle's registration from the glove compartment, Trooper Salas observed two additional packaged air fresheners and a roll of incense. During this initial encounter, the trooper further observed three cell phones on the vehicle's front console. Trooper Salas testified that drug organizations sometimes provide a courier with a cell phone in order to track its contraband: "[I]n addition to the courier's personal cell phone, he will have an additional phone which he is to leave on and it is only for contact with the drug organization." The presence of three cell phones but only two occupants was consistent with such scenario.

Because the vehicle's insurance was under Defendant Pinkney's name, Trooper Salas next asked Pinkney to produce his driver's license to verify his identity. The trooper commented that the picture on the license did not look like Pinkney whereupon Pinkney exposed a tattoo on his left forearm which read "Pinkney." At the same time,

3

Trooper Salas noticed a tattoo on Defendant Pinkney right forearm which read "Killa." This further raised the trooper's suspicions: "The tattoo could be recognized as a street gang tattoo or also a prison tattoo. The word itself 'killer' leads me to associate that individual with some type of violent behavior." The trooper testified that violent street gangs routinely sell narcotics.

Trooper Salas asked Defendant Jeter to accompany him to the patrol car while the trooper checked Defendants' documentation and prepared a warning ticket. On the way, the trooper asked Jeter if he carried any weapons and asked him to expose his waistband. Jeter pulled up his shirt and exposed a tattoo on his stomach which read "Rated R." This again "led [the trooper] to believe that the tattoo was a possible street gang tattoo or a prison tattoo." As Trooper Salas prepared the warning ticket, he continued to speak with Defendant Jeter. During this period, dispatch reported the vehicle was in fact registered under the name of Teanna Floyd and had not been reported stolen. At 9:49 a.m., Trooper Salas provided Jeter with a warning ticket and returned his license. Because dispatch had not yet reported on the validity of Defendant Jeter's license or the existence of any outstanding warrants, Trooper Salas asked Jeter to remain in the patrol car while the trooper returned Defendant Pinkney's documentation. Dispatch contacted Trooper Salas shortly after he returned to the patrol car. Dispatch indicated Jeter's license was valid and he had no outstanding warrants. Having completed the tasks related to the initial purpose of the stop, Trooper Salas next asked Defendant Jeter if he was transporting anything

illegal. Jeter responded no. The trooper asked for permission to search the vehicle. Jeter stated he had no objection. Trooper Salas then approached Defendant Pinkney and asked for permission to search. Pinkney too agreed.

II.

During a routine traffic stop based upon probable cause, a trooper may require a driver to produce a driver's license, vehicle registration, proof of insurance, and any other relevant documentation. See United States v. Gregoire, 425 F.3d 872, 878-79 (10th Cir. 2005). The trooper may then run necessary computer checks and issue a warning or citation. Id. at 879. During this period, questioning need not be limited to travel plans, vehicle ownership, or the like, provided such questioning does not "appreciably lengthen" the driver's detention beyond completion of the tasks at hand. See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259 (10th Cir. 2006); see also United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) ("[M]ere police questioning does not constitute a seizure under the Fourth Amendment.") (citing Muehler v. Mena, 125 S. Ct. 1465, 1471 (2005)). Once the necessary tasks are completed, however, the trooper must allow the driver to proceed on his or her way without undue delay unless reasonable suspicion (or probable cause) exists that the driver is engaged in criminal activity or the driver consents to additional questioning. Gregoire, 425 F.3d at 879.

In this case, the Government has never suggested the encounter between Trooper

5

Salas and Defendants became consensual once the trooper completed the tasks related to the initial purpose of the stop.[1]  Rather, the district court agreed with the Government's argument that reasonable suspicion supported Trooper Salas' extended questioning following receipt of the requested dispatch reports.  Considering the totality of the circumstances, the court concluded "any modest extension of the traffic stop that was required to obtain consent from [Defendants] to search the car was minimal and fully supported by reasonable articulable suspicion that drug trafficking was afoot."

"Reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'"  United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted)).

> Our task is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but rather to determine whether the totality of the circumstances justify the detention.  We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances[.]"

Id. (internal quotations and citations omitted).  Applying these standards, we have little difficulty upholding the district court's conclusion that reasonable suspicion supported

---

[1]  Neither has the Government suggested Defendants' continued detention following receipt of the dispatch reports was in itself reasonable because it did not "appreciably lengthen" the detention related to the initial purpose of the stop.  See United States v. Childs, 277 F.3d 947, 953-54 (7th Cir. 2002) (en banc)  ("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention.").

Trooper Salas' decision to briefly extend the stop and momentarily question Defendants about the possible presence of contraband.

Although the presence of a masking agent such as air freshener alone may be insufficient to establish reasonable suspicion of criminal activity, the presence of numerous air fresheners – in this case at least five – with differing scents, coupled with open rear windows and additional unopened air fresheners in the glove compartment, led Trooper Salas to reasonably suspect Defendants had something to hide beyond body odor. See United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997). The presence of multiple cell phones, while possibly innocuous considered in a vacuum, heightened the trooper's suspicion. See United States v. Windrix, 405 F.3d 1146, 1153 (10th Cir. 2005) (officer's statement that drug traffickers often use multiple cell phones contained in an affidavit establishing probable cause). Lastly, Defendants' tattoos, which suggested possible gang affiliation and a tendency towards violence, were also a part of the totality of the circumstances justifying Trooper Salas' extended questioning of Defendants. See United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003) (an officer is entitled to rely on his experience and specialized training to make inferences from and deductions about the available cumulative information). Because reasonable suspicion justified such questioning prior to Defendants' consent to search, the order of the district court denying Defendants' motion to suppress is–

AFFIRMED.

Entered for the Court,

Bobby R. Baldock
Circuit Judge