**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 30 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LONNIE T. WILSON,

Defendant - Appellant.

No. 03-3118

(D. Kansas)

(D.C. No. 01-CR-20107-02-GTV)

### ORDER AND JUDGMENT[*]

Before **MURPHY, ANDERSON** and **TYMKOVICH,** Circuit Judges.

Lonnie Wilson appeals the district court's denial of his motion to suppress, claiming the police's actions after stopping a vehicle in which Wilson was a passenger exceeded the permissible scope of the stop in violation of the Fourth Amendment. Wilson entered a conditional plea of guilty to a charge of possession of pseudoephedrine in violation of 21 U.S.C. § 841(c)(2) and 18 U.S.C. § 2, reserving his right to bring this appeal. Wilson was sentenced to a

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

term of imprisonment of twelve months and one day, followed by two years' supervised release.

**BACKGROUND**

At approximately 3 a.m. on July 1, 2001, Deputy Alie Watkins, joined by Deputy Darren Eichinger in a separate patrol car, stopped the pickup truck in which Wilson was a passenger for failing to have a light illuminating the license plate, a traffic violation under Kansas law. The deputies testified that they had initially seen the truck when it stopped for gas and recognized the driver, John VanHouden, as someone who was suspected of manufacturing methamphetamine.[1] The deputies had then observed the truck enter and leave the parking lot of a closed Wal-Mart store. Hr'g Tr. at 37; Trial Tr. at 8, R. Supp. After this, the deputies took turns following the truck as it proceeded down the main road, turned off onto a gravel road, and returned to the main road again. Hr'g Tr. at 37, R. Vol. II; Trial Tr. at 9, R. Supp. Deputy Watkins referred to this behavior as "zigzagging" and indicated that it made him suspect that VanHouden was attempting to evade him. Hr'g Tr. at 63, R. Vol. II. At that point, Deputy

---

[1]Deputy Watkins testified that they "had received some information that [VanHouden] was possibly manufacturing methamphetamines." Hr'g Tr. at 36, R. Vol. II. Deputy Eichinger testified that VanHouden had "been suspected of manufacturing methamphetamines . . . for quite some time." Trial Tr. at 35, R. Supp.

Watkins noticed the traffic violation and stopped the truck. Deputy Eichinger also stopped.

Deputy Watkins approached the driver's side of the truck while Deputy Eichinger approached the passenger's side. According to Deputy Watkins' testimony, he smelled alcohol coming from VanHouden and asked VanHouden if he had been drinking. When VanHouden admitted to drinking a beer several hours previously, Deputy Watkins directed VanHouden to get out of the truck in order to conduct sobriety tests.

Meanwhile, Deputy Eichinger, according to his testimony at trial, was talking to Wilson, among other things asking his name, when the deputy smelled "a strong odor of ether coming out of the vehicle." Trial Tr. at 12, R. Supp. Deputy Eichinger testified that this smell made him suspicious because ether is used in the manufacture of methamphetamine. The deputy also noticed that there was something sitting on the floor of the cab between Wilson's feet, covered by a black vest. According to his testimony, Deputy Eichinger "asked [Wilson] if I could see what was under the vest." Id. at 13. Wilson lifted the vest, and Deputy Eichinger observed underneath it a five-gallon bucket containing yellow rubber gloves, glassware, a bowl, and some jars. Deputy Eichinger then told Deputy Watkins, who had just completed an initial sobriety test on VanHouden, that "we may have a possible methamphetamine lab in the cab of the pickup." Id. at 14.

At this point Deputy Eichinger directed Wilson to step out of the truck. The deputy then observed next to the passenger seat a Wal-Mart bag containing lithium batteries. Deputy Eichinger had Wilson sit inside his patrol car while Deputy Watkins had VanHouden sit in the other patrol car, and the two deputies then conducted a search of the truck. Upon examining the contents of the bucket at the foot of the passenger seat more closely, the deputies discovered cans of starting fluid containing ether, a bottle of alcohol, a container of salt, a plastic bag containing white powder, and coffee filters. In the back of the pickup, the deputies found two closed thermoses, one of which, when opened, emitted a strong odor of anhydrous ammonia, and the other of which emitted a strong odor of ether. They also found bottles and face masks. The truck, still containing these items, was then towed and impounded, and Wilson and VanHouden were arrested and driven to the county jail. A search warrant was executed on the impounded truck the following day, and the aforementioned items were recovered. The white powder in the plastic bag was identified as approximately 133 grams of pseudoephedrine.

Wilson was subsequently indicted on charges of attempting to manufacture five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count I), and possessing pseudoephedrine with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1) (Count II). Trial was

originally set for September 4, 2002, but in a pretrial conference on that date, the district court continued the trial until October 1, 2002, in order to allow Wilson's attorney to conduct additional investigation. The court directed that Wilson file any additional pretrial motions by September 16, 2002, and that a hearing on these motions would be held on September 30, 2002. The court then allowed the government to present Deputy Watkins as a witness in response to a pretrial motion Wilson had already filed, with the understanding that this testimony would be part of the record for any further motions. On September 16, 2002, Wilson filed a motion to suppress the evidence seized from the truck. At the September 30 hearing, the district court, as requested by the government, postponed a ruling on the motion to suppress until trial.

After Deputy Eichinger, the first witness at Wilson's trial, testified, Wilson's attorney renewed his motion to suppress, asserting that "what [Deputy Eichinger] did was outside the scope of the traffic stop" because based on his testimony it was not "possible for [Deputy Eichinger] to have smelled ether nor is it logical for him to have smelled ether." Id. at 64. The court denied the motion and issued a finding "that the traffic stop was proper and appropriate and that thereafter they had probable cause to make an arrest and to make a search of the vehicle." Id. In response to a request by Wilson's attorney that the court indicate

specifically the facts that it considered to support probable cause, the court stated, "[t]he evidence that I heard." Id.

On October 4, 2002, the jury found Wilson not guilty on Count I of the indictment and was unable to reach a verdict on Count II, resulting in a mistrial. On December 10, 2002, following a plea agreement between Wilson and the prosecutor, Wilson was charged by information with possession of pseudoephedrine having reasonable cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(2). Wilson appeared in court the same day to plead guilty, reserving his right to appeal the court's denial of his motion to suppress.

In this appeal, Wilson argues that Deputy Eichinger acted in violation of the Fourth Amendment "by ordering [Wilson] to move a leather [vest] which covered a bucket containing items associated with a meth lab." Appellant's Br. at 7. Wilson asserts that Deputy Eichinger's claim to have smelled ether is without any factual support in the record, and that as a matter of law, the smell of ether alone was insufficient to justify extending the scope of the traffic stop.

## DISCUSSION

"In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's factual

findings unless clearly erroneous." United States v. Dickerson, 195 F.3d 1183, 1186 (10th Cir. 1999). Ultimately, the reasonableness of a search or seizure under the Fourth Amendment is a question of law that we review de novo, taking into account the totality of the circumstances. Id.

As an initial matter, we emphasize that Wilson's challenge is to the scope of his seizure during the traffic stop, not to the search of the truck. In order to bring a direct challenge to the search of the truck, Wilson would have to establish "a legitimate expectation of privacy in the particular area[] of the [vehicle] searched," based on either a property or possessory interest in the vehicle itself or an interest in the property seized. Rakas v. Illinois, 439 U.S. 128, 148 (1978) (explaining that a passenger qua passenger would not normally have a legitimate expectation of privacy in the trunk, glove compartment, or area under the seat of a car); see also United States v. Eylicio-Montoya, 18 F.3d 845, 851 (10th Cir. 1994) ("A passenger may establish standing [to challenge a car search] by, inter alia, demonstrating some relationship to the vehicle sufficient to establish her lawful possession or control thereof."); United States v. Jefferson, 925 F.2d 1242, 1249 (10th Cir. 1991) (holding a nonowner passenger claiming no interest in crack seized from the car had no standing to challenge the search); United States v.

Erwin, 875 F.2d 268, 270-71 (10th Cir. 1989) (similar).[2]  Wilson does not assert

any such interest in the truck or its contents.  Nevertheless, Wilson may, as he

does here, "contest the lawfulness of his own detention and seek to suppress

evidence found in the vehicle as the fruit of the illegal detention."  United States

v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); see also United States v.

Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef,

100 F.3d 1491, 1500 (10th Cir. 1996).  Our inquiry here is thus focused on

whether Wilson's detention during the course of the traffic stop was unreasonable

under the Fourth Amendment.

"A traffic stop is a 'seizure' within the meaning of the Fourth

Amendment."  United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001) (en

banc) (further quotation omitted).  This seizure implicates a passenger's Fourth

Amendment interests to the same degree as the driver's.  Erwin, 875 F.2d at 270

("[W]e reject any notion that a vehicular stop detains for Fourth Amendment

purposes *only* the driver simply because the passenger may be free to depart.").

We assess the reasonableness of a routine traffic stop under the principles laid out

---

[2]While we have commonly referred to a passenger's "standing" to challenge a vehicle search, we recognize that the concept of standing in this context is "invariably intertwined" with "the extent of a particular defendant's rights under the Fourth Amendment."  Rakas, 439 U.S. at 139.  As indicated, whether a passenger has "standing" simply depends on whether the passenger has any Fourth Amendment interest to assert.

for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" Holt, 264 F.3d at 1220 (quoting Terry, 392 U.S. at 20); see also id. at 1230 (holding this framework applies whether the traffic stop is based on probable cause or reasonable suspicion). We must examine "both the length of the detention and the manner in which it is carried out," id., keeping in mind that an officer may extend the duration and scope of the initial detention based on "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001); see United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995) (holding that questions on transportation of contraband must be justified by reasonable suspicion even when they do not extend the duration of the stop). When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, "be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification." United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997).

There is no dispute here that Deputy Watkins was justified in initially stopping the truck for failing to illuminate the rear license plate in violation of

Kan. Stat. Ann. § 8-1706(c). See United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) ("An initial traffic stop is valid under the Fourth Amendment . . . if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." (citing United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc))). Wilson also does not dispute that the smell of alcohol on VanHouden together with VanHouden's admission that he had been drinking justified the further detention of the truck and its occupants in order for Deputy Watkins to conduct field sobriety tests on VanHouden. See United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (holding detection of alcohol on a driver's breath during a routine traffic stop gave rise to reasonable suspicion); Rogala v. Dist. of Columbia, 161 F.3d 44, 52 (D.C. Cir. 1998) (holding "only reasonable suspicion is required to conduct [a field sobriety] test"). Furthermore, it is undisputed that Deputy Eichinger's conversation with Wilson, resulting in the disclosure of the bucket and its contents, did not extend the *duration* of the stop beyond the time required for these field sobriety tests. Thus, Wilson's sole contention is that when Deputy Eichinger asked to look under the vest covering the bucket between Wilson's feet, he unreasonably expanded the *scope* of Wilson's detention beyond that permitted based on either a routine traffic violation or a reasonable suspicion that VanHouden was driving under the influence of alcohol.

-10-

We agree that Deputy Eichinger's request to see beneath the vest exceeded the permissible scope of detention for a routine traffic stop based on an equipment violation. We have held that a police officer may, during a routine traffic stop, "ask about the driver's authority to operate the vehicle," check the driver's license and registration, and ask about travel plans. Holt, 264 F.3d at 1221. The officer may also ask a driver to remove an obstruction from a vehicle's dashboard if the vehicle's VIN is not otherwise visible from outside the car. Caro, 248 F.3d at 1245.

However, we have generally required that further questioning by an officer of an investigative nature, including a request to search a vehicle, be legitimately related in its investigative purpose to the officer's reasonable and articulable suspicion of criminal activity. See id. at 1246 (holding an officer could not ask for consent to search a car's passenger compartment for an additional VIN when the VIN on the dashboard was visible from outside the car); United States v. Doyle, 129 F.3d 1372, 1377 (10th Cir. 1997) (holding an officer could ask for consent to search the trunk of a car where he had reasonable suspicion that the driver had crossed the border illegally and could be transporting illegal aliens); Jones, 44 F.3d at 872 (holding an officer could not question a detained driver about the transportation of contraband unless he reasonably suspected the driver

-11-

of transporting drugs).[3]  Here, there is no reason to think, and the government does not argue, that Deputy Eichinger's request had any connection to the license plate violation that justified the initial stop.

We have recognized exceptions to these limitations on a traffic stop's scope based on officers' safety concerns.  For instance, we have held that, for safety reasons, officers may run a criminal history check on the driver and ask whether there are loaded weapons in the vehicle.  Holt, 264 F.3d at 1221-25.  In addition, the Supreme Court held in Maryland v. Wilson that officers may order passengers as well as the driver out of the vehicle during the stop in order to "den[y] access

---

[3]We emphasize that the reason an officer may not ask for consent to search a vehicle during a routine traffic stop is because such a request exceeds the permissible scope of the stop, not because the detention necessarily renders any consent to search involuntary.  Indeed, we have held that a person may voluntarily consent to a vehicle search despite being detained although the government still bears the burden of proving voluntariness.  United States v. Flores, 48 F.3d 467, 468-69 (10th Cir. 1995); United States v. Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir. 1993); see also United States v. Watson, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search.").  For purposes of our Terry stop analysis, we consider a request for consent to search a vehicle equivalent to any question an officer might ask.  The request must therefore either fall within the scope of the officer's reasonable and articulable suspicion of illegal activity, or it must take place after the seizure has ended, during a consensual encounter.  See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) ("A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.").  Where, as here, a defendant challenges only the seizure of his person and not the subsequent search, thus asserting no expectation of privacy in the objects inspected, the voluntariness of his consent to the officer's request to search is not part of our analysis.

to any possible weapon that might be concealed in the interior of the passenger compartment."  519 U.S. 408, 414 (1997); see Holt, 264 F.3d at 1223.

Here, the government, citing Maryland v. Wilson, argues that safety concerns alone justified Deputy Eichinger's request that Wilson move the vest. However, Wilson only held that police could impose the "minimal" intrusion of ordering a passenger out of a car.  519 U.S. at 414.  Similarly, we noted in Holt that merely asking a motorist whether there is a loaded weapon in the vehicle is relatively unintrusive.  264 F.3d at 1223.  The government would have us extend Wilson and Holt by allowing officers, lacking reasonable suspicion, to ask passengers to uncover any objects that are not in plain view.  The government has failed to demonstrate why this greater intrusion – which could in effect allow an officer to inspect a large part of a vehicle's otherwise-concealed contents without either probable cause or the consent of the vehicle's owner – is necessary for officer safety when the officer could simply do what our precedents already permit and either order the passenger out of the vehicle or ask the passenger whether the vehicle contains a loaded weapon.[4]

_____

[4]We recognize that Wilson, as noted above, has asserted no reasonable expectation of privacy in the bucket, its contents, or the area between his feet. Thus, in this particular case, the intrusiveness of Deputy Eichinger's request may appear small with respect to Wilson.  Nevertheless, we believe that such a request is more intrusive than a simple direction to exit the truck or a yes-or-no question about loaded weapons.  Of course, our analysis would be different if the totality

(continued...)

Further, although Deputy Watkins, as discussed above, had reasonable suspicion that justified prolonging the stop, the government does not argue that Deputy Eichinger's request was reasonably related in scope to Deputy Watkins' suspicion that VanHouden was driving under the influence of alcohol. Moreover, Deputy Eichinger himself did not suggest any connection between the two. We thus cannot conclude that Deputy Eichinger's request was justified on this basis and turn to consider whether Deputy Eichinger had reasonable suspicion to make the request on some other basis.

The determination of reasonable suspicion "does not depend upon any one factor, but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993). The evaluation of whether an officer has a "particularized and objective basis for suspecting legal wrongdoing" is made "from the perspective of the reasonable *officer*, not the reasonable *person*." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (internal quotation marks omitted). "Officers must be permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained

---

[4](...continued)
of circumstances in a particular instance gave rise to a reasonable suspicion that there was a safety threat. Here, however, neither of the deputies claimed to have safety concerns with respect to either VanHouden or Wilson.

person.'" Id. (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) (further quotation omitted).

Wilson argues that the only justification given by Deputy Eichinger for asking Wilson to lift the vest was the alleged odor of ether in the truck. Wilson asserts that even if we presume the district court found Deputy Eichinger's claim to have smelled ether credible, the finding would be clearly erroneous based on the record. Wilson further argues that the odor of ether alone cannot give rise to reasonable suspicion.

As Wilson points out, the district court made no specific factual findings when it denied Wilson's motion to suppress. Moreover, the district court's ruling stated only that "the traffic stop was proper and appropriate" and resulted in "probable cause to make an arrest and to make a search of the vehicle." Trial Tr. at 64, R. Supp. The court thus failed to indicate explicitly the intermediary stages at which the officers developed reasonable suspicion sufficient to expand the scope of the initial stop.

We emphasize, as we have before, that it is the district court's responsibility to make findings of fact on the record when necessary to resolve a motion to suppress evidence. Fed. R. Crim. P. 12(d). Here, however, the court did indicate that it accepted Deputy Watkins' and Deputy Eichinger's testimony as credible when it stated that its decision was based on "[t]he evidence that [it

-15-

had] heard," Trial Tr. at 64, R. Supp., and refused to discount on the record Deputy Eichinger's claim of smelling ether despite Wilson's attorney's strong objection at the time that "it is [not] possible for him to have smelled ether nor is it logical for him to have smelled ether." Id. We may thus infer that the court found that the deputy did smell ether and proceed to analyze whether the totality of the circumstances gave rise to reasonable suspicion. See United States v. King, 222 F.3d 1280, 1283 n.2 (10th Cir. 2000) (declining to remand where the record "is sufficiently detailed and developed"); Soto, 988 F.2d at 1554-55 (declining to remand, despite lack of specific findings, where "the relevant facts are undisputed," allowing us to "determine as a matter of law" whether those facts justified an officer's continued questioning); United States v. Gonzalez-Acosta, 989 F.2d 384, 387 (10th Cir. 1993) (declining to remand where the district court concluded an officer had reasonable suspicion but made no specific findings identifying the contributing factors, where a "reasonable view of the evidence" supports the court's holding (internal quotation marks omitted)).

Wilson argues that we should hold such a finding clearly erroneous, asserting that the deputy could not have smelled ether because the aerosol cans of starting fluid in the bucket could not emit an odor without being triggered, and the truck occupants had no reason to use ether at that point because they lacked anhydrous ammonia – an essential ingredient in the methamphetamine

manufacturing process – and ether would be used only after the ammonia.  Wilson also argues that even if he or VanHouden had sprayed the aerosol cans in the car for no reason, the truck's windows had been open so the odor would have dissipated before the deputy could possibly have smelled it.  While Wilson's assertions would lend plausibility to a finding that the deputy did not smell ether, they do not suffice to convince us that the district court's finding to the contrary was clearly erroneous.

Moreover, we do not agree that the odor of ether was the only factor here contributing to a reasonable suspicion of drug-related illegal activity.  The record indicates that at the time of the traffic stop, VanHouden was already known to the deputies as someone suspected of involvement in the manufacture of methamphetamine.  Deputy Eichinger testified that, based on his training and experience in drug crime investigation, he was familiar with ether as an ingredient used to manufacture methamphetamine.  At the time Deputy Eichinger smelled ether, he also saw a covered object between Wilson's feet that was large enough to contain implements used to manufacture methamphetamine.  This combination of factors, we believe, formed an adequate basis for Deputy Eichinger's reasonable suspicion.  See United States v. Stone, 866 F.2d 359, 362 (10th Cir. 1989) (holding the odor of Patchouli oil, the officer's knowledge that the oil was often used to mask the odor of illegal drugs, and the officer's learning from the

DEA that the driver was suspected of involvement in drug smuggling gave rise to reasonable suspicion); <u>United States v. Lopez</u>, 777 F.2d 543, 551 (10th Cir. 1985) (holding the odor of "an ether-like substance" in combination with other circumstances gave officers probable cause to search a vehicle). The deputy's request to move the vest was clearly related to his suspicion that the vest covered materials related to the manufacture of methamphetamine. We thus hold that the scope of Wilson's detention was not unreasonable under the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the district court's denial of the motion to suppress is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

No. 03-3118, *United States v. Wilson*
**TYMKOVICH**, J., concurring.

I agree with the result reached by the court, but write separately for two related reasons. First, I want to emphasize that, while it is true we have consistently held that passengers in a vehicle whose driver is being detained should be considered similarly detained, passengers without possessory interests in the vehicle or items seized do not have the same Fourth Amendment interests as drivers. *See United States v. Eylicio-Montoya*, 18 F.3d 845 (10th Cir. 1994). Such passengers may only challenge the legality of their detention, not the legality of a police search of the vehicle. *Id.*

The majority reaches the undoubtedly correct conclusion here that the police had reasonable suspicion to search the bucket, and therefore much of the discussion of Wilson's consent is unnecessary. *See United States v. Doyle*, 129 F.3d 1372, 1377 n.1 (10th Cir. 1997). The majority, however, goes on to state that "Deputy Eichinger's request to see beneath the vest exceeded the permissible scope of detention for a routine traffic stop based on an equipment violation." *Majority Opinion*, at 11.

This leads to the second reason for this concurrence. I recognize the majority's analysis has support from this court's holdings in *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001) (en banc), and *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001). The holding of *Holt* has come under recent scrutiny in other circuits, which have declined to go as far as it suggests. *See United States*

*v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc) ("questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable"); *United States v. Purcell*, 236 F.3d 1274 (11th Cir. 2001). *See also United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993).

Under the logic of *Holt*, requests for consent somehow turn legal detentions into constitutional violations. Yet the principal holding of *Holt*, that even "in the absence of any particularized suspicion" the police may order passengers out of the vehicle and ask questions relating to travel plans or officer safety, 264 F.3d at 1222, belies this categorical conclusion. It is hard to see how a request for consent is necessarily more intrusive to passengers' Fourth Amendment privacy interests than these inquiries.

The fly in the ointment under our cases is this: Imagine by way of example that the facts were the same except Deputy Eichinger did *not* ask for consent, but simply reached into the cab of the truck and removed the vest. In that case, no "unreasonable" question had been asked, and thus the majority's detention analysis would not apply. Because it is conceded that Wilson did not assert any privacy interest in the bucket and was being legally detained, his only complaint would be that in reaching into the truck the officer conducted an illegal search. This, as we and the majority have emphasized, is not a complaint mere passengers

are entitled to make, and the items in the bucket on the seat would undoubtedly be admissible against Wilson.[1]

On the other hand, as the majority says, our cases seem to imply that because the request for consent was outside the "scope" of the reason for the stop, the simple act of asking for permission should give Wilson the ability to suppress the very same evidence. Thus, if law enforcement were to follow our reasoning in these cases, officers who asked for and received consent from a passenger to conduct a search would be put in a worse position than those who simply conducted the search without requesting consent.

I do not think such a strange result is mandated by the Supreme Court's precedent. I point this out to note what I think is a flaw in the analysis of *Holt*, namely that questions both driver and passengers consent to answer do not necessarily raise Fourth Amendment concerns. We should revisit this issue in an appropriate case.

---

[1] Wilson might in this scenario nevertheless argue that, even if he did not have standing to challenge the illegal search, his fourth amendment rights were still violated in that the search was outside the scope of the detention. This argument, however, would violate the well-established rule that passengers without possessory interests in the evidence seized do not have standing to challenge directly an illegal search, for any defendant could get around the rule simply by asserting that an illegal search, ipso facto, made his detention illegal. In cases such as this one where it is uncontested that the detention was neither itself illegal nor unreasonably long, a passenger without possessory interests in the evidence seized in an illegal search lacks standing to exclude it under the 4th amendment.