**F I L E D**

**PUBLISH**

September 15, 2006

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENTH CIRCUIT**

---

UNITED STATES of AMERICA,

      Plaintiff-Appellee,

v.

ANTONIO GUERRERO-ESPINOZA,

      Defendant-Appellant.

No. 05-8031

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03CR-00247-WFD)**

---

Ronald G. Pretty, Cheyenne, Wyoming, for Defendant-Appellant Antonio Guerrero-Espinoza.

David A. Kubichek, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief) for Plaintiff-Appellee United States of America.

---

Before **TYMKOVICH, HOLLOWAY,** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

    In this direct criminal appeal, Defendant-Appellant Antonio Guerrero-Espinoza ("Guerrero") asserts that the district court erred in denying his motion to suppress illegal drugs discovered in his minivan by a Wyoming state

trooper during a traffic stop. At the time the trooper stopped the minivan for speeding, Guerrero, the minivan's registered owner, was riding as a passenger and another individual was driving. The trooper took the driver to the trooper's patrol car and eventually completed the traffic stop when he returned the driver's license, issued the driver a warning, and let him out of the patrol car. Since the traffic stop had ended, the trooper no longer had authority to detain Guerrero or the driver further. Before the driver returned to the minivan, however, the trooper reinitiated contact with him and then with Guerrero, questioning them about their travel plans and the possible presence of drugs in the minivan. The Government asserts that Guerrero consented to this further detention and questioning. While a completed traffic stop can evolve into a consensual encounter between a citizen and a trooper, it can only do so if a reasonable person in the same circumstances would feel free to decline to answer the trooper's questions and leave. In this case, however, because the trooper completed the traffic stop outside Guerrero's presence and because the released driver never returned to the minivan, a reasonable person in Guerrero's position would not have realized the traffic stop had ended and he was free to leave. Therefore, as far as Guerrero was concerned, the traffic stop did not evolve into a consensual encounter. For these reasons, we REMAND this case to the district court with orders to VACATE Guerrero's convictions.

I. BACKGROUND.

2

A jury convicted Guerrero of three drug charges: possessing 1) more than 500 grams of cocaine and 2) approximately twenty pounds of marijuana, with the intent to distribute both, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and (D); and 3) conspiring to possess those amounts of cocaine and marijuana, with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and (D), 846.[1] The district court sentenced Guerrero to seventy months on each of counts one and three, and sixty months on count two, all to run concurrently. Guerrero now appeals, challenging his convictions and sentence.

On appeal, Guerrero argues the district court 1) erred in denying his motion to suppress the state trooper's discovery of the drugs; 2) denied Guerrero his Sixth Amendment right to confront witnesses when the court allowed the Government to present hearsay evidence of statements the van's driver and Guerrero's wife made during the traffic stop, and between Guerrero and his wife; and 3) abused its discretion in permitting a state trooper to testify to a recorded

---

[1]21 U.S.C. § 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." And 21 U.S.C. § 841(b)(1), in relevant part, provides the following penalties: "In the case of a violation of subsection (a) of this section involving . . . 500 grams or more of . . . cocaine . . . such person shall be sentenced to a term of imprisonment which may not be less than 5 and not more than 40 years." Id. § 841(b)(1)(B)(ii)(II). "In the case of less than 50 kilograms of marihuana, . . . such person shall . . . be sentenced to a term of imprisonment of not more than 5 years . . . ." Id. § 841(b)(1)(D). Further, 21 U.S.C. § 846 provides that "[a]ny person who attempts to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

conversation between Guerrero and his wife that occurred in the back of a patrol car. Guerrero further argues that 4) the statutory mandatory minimum sentence that applied to two of his convictions was unconstitutional. Because we conclude the district court erred in denying Guerrero's motion to suppress, we do not address Guerrero's other issues. Having jurisdiction to consider this appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, therefore, we REMAND this case to the district court with instructions to VACATE Guerrero's convictions.

## II. STANDARD OF REVIEW

"When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government, accepting the district court's factual findings unless clearly erroneous. Fourth amendment reasonableness is reviewed de novo." United States v. Gregoire, 425 F.3d 872, 875 (10th Cir. 2005) (citation omitted). The Government bears the burden of demonstrating reasonableness. See United States v. Herrera, 444 F.3d 1238, 1242 (10th Cir. 2006).

## III. DISCUSSION

### A. Relevant Facts.

Viewing the evidence[2] in the light most favorable to the government, see id., the evidence presented at the pretrial suppression hearing established the

---

[2]We GRANT Guerrero's motion to supplement the record to include the videotape of the traffic stop.

4

following: On October 19, 2003, a state trooper, Benjamin Peech, stopped a white minivan with a Mississippi license plate that was travelling eastbound on Interstate 80 just east of Cheyenne, Wyoming. The trooper's radar gun indicated that the minivan was travelling eighty-four miles per hour, in excess of the posted seventy-five-miles-per-hour speed limit. The minivan's occupants included Alfredo Anguiano-Cipres ("Cipres" or "the driver"), Guerrero,[3] and Guerrero's wife, Edelmira Hernandez-Mancilla ("Hernandez").

The trooper stopped the van at 8:06 a.m. He approached the driver, Cipres, and asked for his driver's license, the vehicle's registration, and proof of insurance. Because Cipres did not speak English very well, the trooper spoke to Cipres in Spanish. Cipres produced a California driver's license.

At this same time, Guerrero, the minivan's owner who was sitting in the front passenger seat, was going through a stack of papers he had retrieved from the glove box, apparently looking for the vehicle's registration. The trooper offered to help Guerrero find the registration and Guerrero agreed, handing Trooper Peech this entire stack of papers. The trooper took the stack of papers back to his patrol car, accompanied by Cipres.

While sitting in his patrol car with Cipres, the trooper wrote Cipres a warning for speeding. The trooper also eventually located the vehicle's

---

[3]During the suppression hearing, Guerrero is frequently referred to as Jose Ortego Moreno.

5

registration in the stack of documents Guerrero had given him—the van was registered in Mississippi to Guerrero. The trooper, however, was unable to locate any indication that the minivan was insured. Trooper Peech gave Cipres the warning and handed him back his driver's license, but indicated to Cipres that the trooper had to speak further with Guerrero about the vehicle's insurance. Cipres remained in the patrol car. Trooper Peech testified that Cipres was not free to leave the patrol car at that time.

Leaving Cipres in the patrol car, Trooper Peech went to the passenger side of the minivan to verify with Guerrero that he was the van's owner and to ask him about the van's insurance. This occurred at 8:16 a.m. The trooper spoke with Guerrero in both Spanish and English after Guerrero indicated that he could speak English pretty well. Guerrero acknowledged that he owned the van and told the trooper that: he had been in Mexico for the past three months; during that time he had left the van with his brother; and the brother was supposed to pay the insurance on the van. Guerrero never produced any proof of insurance.[4]

Trooper Peech gave Guerrero back the stack of papers taken from the minivan's glove compartment, including the vehicle's registration, and then returned to his patrol car. There, he opened the door of the patrol car to allow

---

[4]Wyoming requires motorists to have liability coverage. See Wyo. Stat. § 31-4-103(a). This statute, however, does not apply if a non-resident's vehicle is registered in another state and the vehicle is insured in accordance with that state's requirements. See id.

6

Cipres to exit the vehicle. Although Trooper Peech did not tell Cipres he was free to drive away, the trooper deemed the traffic stop to be over at this point. As Cipres got out of the patrol car and started walking toward the minivan, however, Trooper Peech "recontacted" Cipres and asked him if the trooper could ask him some more questions. Cipres agreed. Trooper Peech then inquired about Cipres's travel plans and his relationship to Guerrero. This conversation occurred on the side of the highway while the two men were standing between the van and the patrol car. Trooper Peech then asked Cipres if the trooper could speak to Guerrero again. Cipres agreed. Trooper Peech returned to the van's front passenger area to speak with Guerrero. Although the trooper testified that Cipres was free to get back into the minivan at this time, Cipres did not do so, but instead remained standing on the side of the highway, at the back of the van, during Trooper Peech's conversation with Guerrero.

According to the state trooper, Guerrero "pretty much" agreed that the trooper could ask him some more questions. Trooper Peech first questioned Guerrero about his travel plans, and then asked Guerrero if he had any guns or illegal drugs in the vehicle. Guerrero answered that he did not. The trooper asked Guerrero twice, in both Spanish and English, if the trooper could search the van. Guerrero twice replied that the trooper could search. Trooper Peech then went back to Cipres, who was still standing at the back of the van. He asked Cipres if he had anything in the car, and Cipres indicated that he had a suitcase.

7

Trooper Peech asked if he could search Cipres's suitcase, and Cipres agreed. Trooper Peech then asked Guerrero, Cipres, and Guerrero's wife, Hernandez, to stand outside the van while he searched.

The first place Trooper Peech searched was the undercarriage of the van, where he noticed "tooling" marks—marks indicating tools had been used on the bolts and screws—as well as other apparent alterations on and near the gas tank. The trooper then called for a drug-sniffing dog. He also went inside the van, where he located what appeared to be an access point to the gas tank. While he was doing this, Cipres, Guerrero, and Hernandez approached the van. Trooper Peech asked them to get back, and then asked again if he could continue searching. Guerrero said yes.

Two additional troopers arrived, one with a drug-sniffing dog. Trooper Peech asked Guerrero if the dog could search the van. Guerrero eventually agreed. The dog positively alerted to the presence of drugs. The troopers then renewed their search efforts, discovering a hidden compartment in the gas tank. In that compartment the troopers discovered several wrapped packages of marijuana and cocaine.

**B.     Legal Analysis.**

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).

"The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."

United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001) (reh'g en banc) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977) (per curiam)).

There is no question that "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Bradford, 423 F.3d at 1156 (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Nor is there a question that the state trooper seized Guerrero, the passenger, along with the driver, when the trooper pulled the minivan over for speeding. See United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989) (recognizing passenger is also seized, for Fourth Amendment purposes, when driver of car in which he is riding is pulled over for a traffic stop).

Because "a routine traffic stop is more analogous to an investigative detention than a custodial arrest," it is governed by the

principles developed for investigative detentions set forth in Terry v. Ohio, 392 U.S. 1 . . . (1968). To determine the reasonableness of an investigative detention, we make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

Bradford, 423 F.3d at 1156 (quoting Terry, 392 U.S. at 20). In this case,

9

Guerrero does not challenge the validity of the initial traffic stop. Rather, he argues only that the trooper unlawfully prolonged the stop beyond the reasons that justified the stop in the first place.[5]

> In the course of a routine traffic stop,
>
> a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation. Once those tasks are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in criminal activity or the driver consents to additional questioning.

Gregoire, 425 F.3d at 879 (citation omitted). "[O]nce the purpose of the stop is satisfied and the underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay." United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006). In this case, the Government does not assert that the state trooper had reasonable suspicion of any criminal activity, apart from speeding, sufficient to prolong the stop beyond investigation of the traffic offense, but instead argues that Guerrero consented to the additional questioning. The district court found that was true. That finding, however, was clearly

---

[5]During oral argument, the Government argued that Guerrero had failed to raise this objection in his suppression motion. But that is not the case. Guerrero clearly argued before the district court that this traffic stop did not evolve into a consensual encounter between Guerrero and Trooper Peech because under the circumstances a reasonable person would not have felt free to leave. And the district court, in denying Guerrero's suppression motion, specifically found that "the encounter after Trooper Peech returned the driver's license and registration to Mr. Cipres and the envelope to Mr. [Guerrero] was purely consensual." In light of this, we are satisfied that Guerrero adequately preserved this issue for review.

10

erroneous. See Gregoire, 425 F.3d at 879 (reviewing the district court's finding of whether a detained motorist consented to additional questioning or a prolonged detention for clear error); see also United States v. Taverna, 348 F.3d 873, 879 (10th Cir. 2003).

"A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999) (quotation omitted). A "seizure," by contrast, occurs when an individual "has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way." Id. "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[6] United States v. Wallace, 429 F.3d 969, 974-75 (10th Cir. 2005) (quotation omitted).

---

[6]In light of the Supreme Court's decision in Muehler v. Mena, 544 U.S. 93 (2005), a trooper can validly ask questions during a lawful traffic stop that are unrelated to the stop. See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006) (holding, in light of Mena, that as long as officer's questioning does not extend length of traffic detention, there is no Fourth Amendment issue regarding the content of the officer's questions); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) (same). In this case, however, there is no dispute that the traffic stop had already ended before the trooper asked Guerrero whether there were illegal drugs in the minivan. Therefore, any questions the trooper asked after he completed the traffic stop prolonged Guerrero's detention. For this reason, Mena does not control the resolution of this case. Cf. Mena, 544 U.S. at 101 (noting challenged questioning in that case did not extend time of detention).

11

If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs. A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave. An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.

Bradford, 423 F.3d at 1158 (citations, quotations omitted). "The government bears the burden of proving voluntary consent based on the totality of the circumstances." Gregoire, 425 F.3d at 879.

This court "follow[s] the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to her."[7] Bradford, 423 F.3d at 1158 (quotation, alteration omitted;

_____

[7]During a "routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search." United States v. Burch, 153 F.3d 1140, 1143 (10th Cir. 1998). Therefore, although "determining whether an officer and driver are engaged in a consensual encounter typically requires the court to focus on the totality of the circumstances in a particular case, this circuit has consistently applied at least one bright-line rule: an officer must return a driver's documentation before the detention can end." United States v. Mendez, 118 F.3d

(continued...)

emphasis added); see also Wallace, 429 F.3d at 974-75. "The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual." Bradford, 423 F.3d at 1158. "The issue [then] is whether law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter." Gregoire, 425 F.3d at 879; see also Bradford, 423 F.3d at 1158.

In this case, Trooper Peech testified, and the district court found, that the traffic stop ended after the trooper returned Cipres's driver's license, gave him the warning and opened the patrol car door so Cipres could get out of the patrol car and return to the minivan. Under these circumstances, arguably a reasonable person in Cipres's position might have believed he was free to leave. See Bradford, 423 F.3d at 1159. But there is no evidence that a reasonable person in Guerrero's position would have believed he was free to leave.[8] While the trooper

_____

[7](...continued)
1426, 1430 (10th Cir. 1997).

[8]In our cases addressing when a traffic detention concludes and whether or not a traffic stop turns into a consensual encounter, we usually ask whether the driver consented to extending the detention in order to answer the officer's questions. See, e.g., Wallace, 429 F.3d at 974-75 (addressing situation where, after traffic stop ended, driver consented to answering officer's questions and to search of vehicle); Gregoire, 425 F.3d at 874-75, 879 (holding driver consented to additional questioning after officer issued warning); Bradford, 423 F.3d at 1158-59 (holding driver voluntarily consented to further questions after trooper returned driver's documentation); United States v. Rosborough, 366 F.3d 1145, (continued...)

13

had already returned Cipres's driver's license and had completed writing Cipres a warning, there is no evidence that Guerrero knew that. Those events had all occurred in the patrol car, out of Guerrero's presence; Guerrero had remained in the minivan throughout the traffic stop. Certainly Guerrero could see that Trooper Peech eventually allowed Cipres to get out of the patrol car, after the trooper had spoken with Guerrero about the van's insurance. But Cipres did not return to the van; instead, it would have appeared to a reasonable person in Guerrero's position that the trooper detained Cipres further, this time at the back

_____

[8](...continued)
1148-49 (10th Cir. 2004) (holding driver voluntarily consented to search of his vehicle after officer returned driver's license, registration and issued a warning); United States v. Cline, 349 F.3d 1276, 1288 (10th Cir. 2003) (holding driver voluntarily consented to search after officer returned driver's license and told driver he was free to go); United States v. Manjarraz, 348 F.3d 881, 884, 885-86 (10th Cir. 2003) (holding officer's encounter with driver became consensual after officer returned driver's license, issued warning and told driver they were "through"); Taverna, 348 F.3d at 876, 878-79 (holding traffic stop became consensual encounter after officer returned driver's documentation, issued warning, and allowed driver to get out of patrol car); United States v. Bustillos-Munoz, 235 F.3d 505, 514-15 (10th Cir. 2000) (holding traffic stop became consensual encounter after officer returned license and vehicle registration to driver and informed driver he was free to leave); United States v. West, 219 F.3d 1171, 1176-77 (10th Cir. 2000) (holding traffic stop between officer and driver became consensual encounter after officer returned driver's documentation and issued warning); United States v. Ozbirn, 189 F.3d 1194, 1200 (10th Cir. 1999) (holding, e.g., driver consented to answer additional questions after officer completed traffic stop by issuing warning). In those cases, the driver is of course aware that the officer has already returned his license and issued a warning or ticket. Those cases, however, are not dispositive of the issue this case presents, where we are concerned with the passenger/vehicle owner Guerrero's consent to answer additional questions, after the trooper, unbeknownst to Guerrero, has concluded the traffic stop by returning the driver's license and giving the driver a warning.

14

of the van, asking him further questions. Although Cipres consented to this further questioning, there is no evidence that Guerrero was aware of that. And when Trooper Peech then approached Guerrero also to ask him further questions, Cipres remained standing at the back of the van. Although the trooper testified that he had not told Cipres to remain outside the minivan and, as far as the trooper was concerned, Cipres could have returned to the van at any time, there is again no evidence that Guerrero was aware of that, either.

What a reasonable person in Guerrero's position would have known is that, as the minivan's owner, he had been unable to provide Trooper Peech with any proof of insurance for the minivan and he had given the trooper only what can be described as a fairly lame story about why Guerrero could not produce any proof of insurance. Despite the fact that the trooper had previously returned the van's registration to Guerrero, there is no evidence from which Guerrero could have believed that the trooper was satisfied with Guerrero's insurance story. So, as far as Guerrero knew, the traffic stop had not yet ended. More to the point, a reasonable person in Guerrero's position would not have felt free at that time to decline to answer the trooper's questions and instead leave. Yet, because Trooper Peech had concluded the traffic stop, unbeknownst to Guerrero, the trooper could no longer lawfully detain Guerrero. Guerrero's decision to answer Trooper Peech's additional questions, therefore, cannot be considered consent to prolong the traffic stop; rather, it was the product of Guerrero's unlawful detention.

15

"[A]s a general rule any evidence obtained as a result of [an unlawful] detention must be excluded as fruit of the poisonous tree." United States v. Santana-Garcia, 264 F.3d 1188, 1191 (10th Cir. 2001); see also United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (holding that after a traffic stop ends, and absent reasonable suspicion or voluntary consent to additional questioning, "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms") (quotation omitted); United States v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993) (noting that, despite defendant's consent to search, "the evidence obtained from the resulting search might be excludable if the consent was obtained during an illegal detention"). The Government does not argue that there is any reason in this particular case why that general rule should not apply. See generally United States v. Walker, 933 F.2d 812, 817-18 (10th Cir. 1991) (noting an unlawfully detained defendant could still voluntarily consent to search, if that consent was purged of any taint from unlawful detention; noting, however, that it is the Government who bears the burden of proving voluntariness of consent). The district court, therefore, erred in denying Guerrero's motion to suppress.[9]

IV.   CONCLUSION

---

[9]The Government does not assert any alternate grounds on which this court could affirm the district court's decision to deny Guerrero's suppression motion. See Edgerton, 438 F.3d at 1051 (declining to address whether there was reasonable suspicion that would have justified extending a detention where Government did not make that alternative argument).

16

For the foregoing reasons, we REMAND this case with directions to the

district court to VACATE Guerrero's three drug convictions.[10]

---

[10]The Government, of course, is free to pursue its prosecution of Guerrero without the suppressed evidence. But based on the record before this court, it does not appear likely that the Government would choose to do so. For that reason, Guerrero's remaining arguments appear to be moot and so we decline to address them at this time.

05-8031, *United States v. Guerrero-Espinoza*.

**TYMKOVICH**, Circuit Judge, dissenting.

We have consistently applied a "bright-line" rule to requests for consent to search during traffic encounters. Consent is properly obtained under our cases only after a traffic stop has ended and the driver is free to leave. *See, e.g., United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001). Today's holding carves out an exception to that rule for passengers, and instead looks to the expectations of the "objective passenger." While I have some reservations about the merits of the bright-line rule, *see United States v. Wilson*, 96 F.App'x. 640 (10th Cir. 2004) (Tymkovich, J., concurring), it is the law of the Circuit and is not at issue today.[1]

In my view, our precedent requires us to apply the bright-line rule to the facts of this case. The traffic stop ended when the officer returned Mr. Cipres's driver's license to him with a warning and permitted him to return to his car. Neither Mr. Cipres nor Mr. Guerrero were detained at that point. And nothing in the record suggests their subsequent consent to additional questioning and the search was the product of coercion or intimidation. Accordingly, (1) since the traffic stop had ended, and (2) consent had been freely given, then (3) the search of the car was lawful.

---

[1] My reservations with *Holt* are three-fold: (1) it bars even de minimis non-coercive requests for consent; (2) it creates an arbitrary category of questioning (requests for consent) that are off limits, but allows questioning pertaining to travel plans and concealed weapons; (3) it conflicts with the Supreme Court's totality of the circumstances approach. *See Muehler v. Mena*, 544 U.S. 93 (2005); *Ohio v. Robinette*, 519 U.S. 33 (1996).

Our precedent is well settled that a "traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration." *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005). The "voluntary cooperation of a private citizen in response to non-coercive questioning" is a mainstay of routine encounters between police and the public, and should be encouraged. *Id.* After a traffic stop has ended, when a "driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs." *Id.* at 1159.

During the traffic stop itself, we have previously limited police questioning to routine inquiries into car ownership, travel plans, and possession of loaded weapons. *Id.* at 1156; *Holt*, 264 F.3d at 1221–22. In a recent application of these principles, however, we recognized that questioning "regardless of topic" that does "not prolong the detention [during] the license check" is no longer off limits. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (applying *Muehler v. Mena*, 544 U.S. 93 (2005)); *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). Thus, routine questioning that has a de minimis affect on the duration of the traffic stop is now permissible.

The majority opinion conflicts with these principles. First, our cases applying the bright-line approach naturally look to the driver's Fourth Amendment interests. The driver ordinarily controls the vehicle—when the driver is free to go, the passenger is free to go. *See United States v. Erwin*, 875 F.2d

2

268, 270 (10th Cir. 1989) ("Drivers and passengers have similar interests in . . . [the] unreasonable seizure [context]."). The majority opinion unnecessarily introduces a new element to an officer's assessment of the encounter—does the *passenger* know that the traffic stop has ended? To the extent the passenger benefits from our bright-line rule preventing lawful requests for consent during the *driver's* detention, similarly the officer should benefit from the rule once the traffic stop has ended. If the driver agrees to additional questioning at the conclusion of a traffic stop, the encounter becomes consensual as to both the driver and passenger. It make little sense to add to the officer's calculus a new "objective passenger" consideration.

In this case, after the traffic stop ended, Mr. Cipres consented (1) to additional questioning, and (2) to the officer speaking with Mr. Guerrero. The officer was detaining neither Mr. Cipres nor Mr. Guerrero at that time and the subsequent search was consensual.[2]

Second, the majority opinion's new rule conflicts with our recent decision in *Alcaraz-Arellano*. If the traffic encounter has not ended so far as the passenger is concerned, as the majority maintains, any questioning that does "not prolong

---

[2] It makes no difference that Mr. Guerrero owned the car. The detention ended when Mr. Cipres was released; Mr. Cipres and Mr. Guerrero consented to further questioning at that time despite the fact that both were free to leave. In addition, nothing suggests the officer was detaining Mr. Guerrero for further questioning regarding his proof of insurance after the car's registration had been returned.

3

the detention" is permissible "regardless of topic." 441 F.3d at 1259 (applying *Muehler v. Mena*, 544 U.S. at 1471–72). Accordingly, even if Mr. Guerrero was unaware of the return of Mr. Cipres's driver's license, he may still be subject to consensual questioning. The additional questioning did not prolong the detention—in any objective sense—because both driver and passenger were free to go. The majority agrees that the traffic stop ended before Mr. Guerrero was questioned, but then concludes that the officer's questioning "prolonged the detention." (Op. at 11 n.6). This conclusion cannot be squared with applicable Tenth Circuit and Supreme Court precedent.[3]

Finally, our cases should promote cooperation between police and citizens. Absent a show of force, there is no good reason to add another layer of complexity to our Fourth Amendment traffic stop jurisprudence, especially in cases like this one where the district court found consent to additional questioning and the search by both the driver and the passenger. In any event, I fail to see why the Fourth Amendment would compel a per se rule barring consent obtained during the course of a routine traffic encounter.

Applying our error standards, several conclusions follow: (1) the traffic encounter ended for all parties when the officer returned Mr. Cipres's driver's license with a warning; (2) Mr. Cipres's consent to additional questioning was

---

[3] Under *Alcaraz-Arellano,* the case would be even clearer as to Mr. Guerrero if consent had been sought while the officer was completing the routine paperwork associated with the traffic stop.

4

voluntary; (3) Mr. Guerrero was not detained under our bright-line rule and his consent was voluntary, and (4) even if Mr. Guerrero was detained according to an objective passenger standard, the additional questioning did not prolong the encounter and was permissible.

I would therefore uphold the search under the totality of the circumstances.