FILED
United States Court of Appeals
Tenth Circuit

**July 18, 2011**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JUAN CHAVEZ,

    Defendant - Appellant.

No. 10-2114
(D.C. No. 1:09-CR-00910-JEC-1)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **EBEL** and **MURPHY**, Circuit Judges.

Defendant-Appellant Juan Chavez was found guilty of one count of illegal reentry by a previously deported alien and sentenced to 51 months in prison. In this appeal, Chavez challenges the district court's denial of his motion to suppress evidence of his identity discovered during an encounter with a law-enforcement officer at a Greyhound bus station in Albuquerque, New Mexico. We have jurisdiction over Chavez's appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Although the district court failed to

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

make express findings of fact in denying Chavez's motion to suppress, we conclude that the evidence in the record can reasonably be viewed to support the district court's ruling. Specifically, the record supports a conclusion that Chavez's encounter with the police officer remained consensual until the officer developed probable cause to detain Chavez. Therefore, the officer did not learn Chavez's identity as a result of an unlawful seizure, and we AFFIRM.

## I.  BACKGROUND

Jeremy Basset, a narcotics agent with the Albuquerque Police Department and Federal Drug Enforcement Administration, has conducted interdiction work at the Greyhound bus station in Albuquerque, New Mexico, for the past six years.  Five days per week, Agent Basset meets Bus 1364, an eastbound bus that originates in Southern California and travels through Albuquerque en route to the East Coast.  According to Agent Basset, that bus is commonly used to smuggle illegal weapons and narcotics, and individuals with outstanding warrants in western states often use the bus to travel east to evade the law. Agent Basset dresses in plainclothes, conceals his weapon in his pants, and keeps his badge in his pocket.

On February 18, 2009, Agent Basset encountered Juan Chavez.  Chavez had originally boarded Bus 1364 in Flagstaff, Arizona, and was preparing to reboard after taking a smoke and restroom break in Albuquerque.  As Chavez was waiting in line with the other reboarders, he noticed Agent Basset speaking with other people, searching

2

luggage, and conducting pat-downs. Agent Basset was positioned near the door of the bus such that it was not possible for passengers to enter the bus without walking past him.

When Chavez approached, Agent Basset took out his badge and said, "How are you doing, sir? I'm a police officer. May I speak with you for a moment?" (Record on Appeal ("ROA"), vol. III at 19.) Agent Basset did not inform Chavez that he had the option to say no. Chavez acted surprised to see Agent Basset and quickly broke eye contact with him; however, Chavez did not decline Agent Basset's request or walk away, so Agent Basset began asking questions about Chavez's travel plans. Chavez informed Agent Basset that he was coming from Flagstaff and moving to the East Coast. At that point, Agent Basset asked if he could see Chavez's bus ticket, and Chavez produced it. Agent Basset testified that Chavez's hand was shaking as he handed over the ticket.

Agent Basset then inquired about Chavez's luggage. Chavez was carrying only one small bag, which Agent Basset characterized as a "handbag." (Id. at 21.) Agent Basset first asked Chavez if any of the luggage sitting on the ground outside of the bus belonged to him. Agent Basset testified that Chavez hesitated as if he were "searching for an answer," which Agent Basset found "a little suspicious." (Id.) Chavez then truthfully answered that none of the bags were his. Agent Basset next asked if any of the bags in the luggage compartment of the bus belonged to Chavez, to which Chavez also responded no. Finally, Agent Basset asked if the small bag that Chavez was carrying on his shoulder was his only piece of luggage. After Chavez said yes, Agent Basset examined Chavez's bus ticket and confirmed that Chavez did not have any luggage

3

receipts. At that point, Agent Basset handed the ticket back to Chavez and noticed that Chavez still did not appear comfortable.[1]

After learning that Chavez did not have any other luggage, Agent Basset asked for permission to search Chavez's one bag. Chavez consented, and Agent Basset discovered some clothing, personal items, and a bottle of red wine. Because Greyhound policy prohibits passengers from carrying wine on buses, Agent Basset asked Chavez if he was acting nervous because of the wine in his bag. Chavez responded that he was not nervous about the wine. But Agent Basset testified that Chavez never acted more comfortable and that "[h]e continued to appear elevated and stressed." (Id. at 24.) Thus, Agent Basset began to suspect that "maybe [Chavez] was running from law enforcement, maybe something happened in the Flagstaff area." (Id.)

After searching Chavez's bag, Agent Basset asked Chavez for some identification. By this time, all of the other reboarders had entered the bus, including those that were originally standing behind Chavez in line. Chavez produced his El Salvadoran passport, which Agent Basset briefly examined and returned. Agent Basset then called the El Paso Intelligence Center ("EPIC")[2] to determine if there were any warrants out for Chavez.

---

[1] On appeal, Chavez claims that Agent Basset did not return his bus ticket until later in the encounter, after Agent Basset searched his bag. We address the ambiguity in the record on this point below in Part III.A.

[2] EPIC is an intelligence-gathering center that pools information from a variety of state and federal law-enforcement sources and provides that information to officers in the field.

Continued . . .

4

Within a few moments, EPIC informed Agent Basset that it had discovered "some type of warrant" in Chavez's name.[3] (Id. at 27.) Agent Basset thus asked for Chavez's passport again so that he could use identifying information on the passport to confirm with EPIC that he had the right individual.

After speaking with EPIC, Agent Basset called Border Patrol for assistance because he "didn't feel comfortable 100 percent identifying [Chavez] from the passport." (Id. at 28.) Agent Basset then gave Chavez his passport back and said, "They're telling me there's some type of warrant or something for you. I don't know what it is. I don't understand what they're telling me, what type of warrant it is. And I'm not sure exactly who you are." (Id.) At that point, Agent Basset conducted a pat-down search of Chavez's person[4] and instructed Chavez to wait by a building near the buses until Border Patrol personnel arrived.

The entire encounter between Agent Basset and Chavez lasted three to five minutes. Border Patrol agents arrived within ten or fifteen minutes after Agent Basset instructed Chavez to wait by the building. The Border Patrol agents immediately

---

[3] The "warrant" was in fact an order of reinstatement of deportation, which is issued when a previously deported individual returns to the United States without permission within ten years of the deportation.

[4] On appeal, Chavez contends that Agent Basset conducted two pat-downs, one immediately after searching his bag and one after learning of the "warrant." We discuss the ambiguity in the record regarding the pat-down below in Part III.B.

discovered that Chavez's passport contained no visas, and Chavez admitted to them that he had been previously deported. Accordingly, the agents took Chavez "to the station for processing." (Id. at 61.) During "processing," the agents fingerprinted Chavez and input the fingerprints into a federal database, which revealed that Chavez had previously been deported to El Salvador.

On April 9, 2009, a federal grand jury returned a one-count indictment charging Chavez with illegally reentering the United States after having previously been deported, in violation of 8 U.S.C. § 1326(a) and (b). On July 10, 2009, Chavez filed a motion to suppress in the district court. Chavez argued that Agent Basset violated the Fourth Amendment by seizing him without reasonable suspicion or probable cause, and that the court should suppress the evidence obtained as a result of the wrongful seizure—namely, Chavez's identity.[5]

The district court held a hearing on the motion to suppress on July 30, 2009. At the end of the hearing, the court ruled orally from the bench and denied Chavez's motion in its entirety. The court determined that the initial encounter between Agent Basset and Chavez was consensual such that Agent Basset did not need reasonable suspicion or probable cause. The court also concluded that Agent Basset developed reasonable suspicion briefly to detain Chavez for further investigation after Chavez's statements that

---

[5] Chavez also sought to exclude various statements made to Agent Basset and Border Patrol agents under Miranda v. Arizona, 384 U.S. 436 (1966), and Federal Rules of Evidence 402, 403, and 701. The district court's rulings on these issues are not before us on appeal.

he was moving to the East Coast and that his only luggage was his shoulder bag. Finally, the court ruled that Agent Basset had probable cause to arrest or otherwise detain Chavez once he learned about the outstanding immigration "warrant" from EPIC. The court memorialized its ruling in a written order dated August 3, 2009. But the court never clarified exactly when (or even if) the consensual encounter between Chavez and Agent Basset transformed into a seizure. Nor did the court make any express findings of fact.

On September 15, 2009, a jury found Chavez guilty of the one count charged against him in the indictment. On May 5, 2010, the district court sentenced Chavez to 51 months in prison. This appeal followed. The only question presented only appeal is whether the district court erred in denying Chavez's motion to suppress evidence of his identity.

## II.     STANDARD OF REVIEW

When reviewing a district court's denial of a motion to suppress, we review Fourth Amendment reasonableness de novo. United States v. Guerrero-Espinoza, 462 F.3d 1302, 1305 (10th Cir. 2006). Ordinarily, we accept the district court's factual findings unless clearly erroneous. Id. But "[w]here, as here, there are no express factual findings, we uphold the district court's ruling if there is any reasonable view of the evidence to support it."[6] United States v. Broomfield, 201 F.3d 1270, 1273 (10th Cir. 2000).

---

[6] If findings of fact are necessary to resolve a motion to suppress, the district court has a responsibility under Federal Rule of Criminal Procedure 12 to make those findings on the record. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding

Continued . . .

## III.  DISCUSSION

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment's prohibition against 'unreasonable . . . seizures' is inadmissible at trial."  United States v. Muldrow, 19 F.3d 1332, 1335 (10th Cir. 1994).  Of course, "not all personal intercourse between policemen and citizens involves 'seizures' of persons."  Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).  Indeed, it is well established that "[m]erely approaching an individual in a public place and asking questions of the individual, including asking to examine the person's identification or requesting the person's consent to search his or her luggage is not a seizure implicating the Fourth Amendment."  United States v. Evans, 937 F.2d 1534, 1537 (10th Cir. 1991).  But "it is [also] settled that the nature of the police-citizen encounter can change—what may begin as a consensual encounter may change to an

---

a motion, the court must state its essential findings on the record.").  "[W]hen the district court fails to meet that obligation and the record from the district court proceedings 'is insufficiently developed regarding the suppression issue' to allow this court to resolve an appeal, a remand for further factual findings is the appropriate remedy."  United States v. King, 222 F.3d 1280, 1283 n.2 (10th Cir. 2000) (quoting United States v. Ramstad, 219 F.3d 1263, 1265 (10th Cir. 2000)).  If, however, the record is "sufficiently detailed and developed to avoid the need for remand," we will affirm the district court's ruling on a motion to suppress as long as any reasonable view of the evidence supports that ruling.  Id.  We conclude that the record in the instant case is developed enough to avoid the need for a remand.

investigative detention if the police conduct changes." United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006) (internal quotation marks omitted).

Chavez argues that this case involves a change from a consensual encounter to a seizure. Specifically, Chavez contends that Agent Basset transformed the encounter into a seizure when he took possession of Chavez's bus ticket and failed to return the ticket until after he searched Chavez's bag. Chavez also claims that Agent Basset continued the detention by conducting a pat-down immediately after searching Chavez's bag and returning the bus ticket. According to Chavez, then, he was detained at the time he produced his passport and Agent Basset learned his identity. Furthermore, Chavez asserts that Agent Basset lacked objective justification to detain him at that point in the encounter; therefore, the district court erred in refusing to suppress evidence of his identity.

By contrast, the Government argues that Agent Basset returned Chavez's ticket immediately after checking it for luggage receipts and conducted a pat-down search only after learning of the "warrant" from EPIC. In the Government's view, the consensual encounter did not become a seizure until after Agent Basset developed probable cause to detain Chavez based on the "warrant." Consequently, the Government asks us to affirm the district court's decision without reaching the issue of whether Agent Basset had reasonable suspicion or probable cause at some point in the encounter before he learned of the "warrant."

9

As an initial matter, we agree with Chavez that a police officer's prolonged retention of an individual's bus ticket or conducting a pat-down search could transform a consensual encounter into a Fourth Amendment "seizure." See United States v. Rogers, 556 F.3d 1130, 1137–38 (10th Cir. 2009) (listing, among the factors to be considered in determining whether an encounter constitutes a seizure, "physical touching by an officer" and "prolonged retention of a person's personal effects"). Having carefully reviewed the record, however, we conclude that Chavez's argument turns entirely on our resolution of two factual ambiguities—namely, the timing of the return of Chavez's bus ticket and the timing of Agent Basset's pat-down search. Further, for the reasons explained below, we conclude that the record can reasonably be read to support the Government's arguments that Agent Basset returned Chavez's ticket promptly after examining it and did not conduct a pat-down search until after his conversation with EPIC. Under this view of the evidence, the encounter remained consensual until at least the point when Agent Basset conducted the pat-down, which occurred after Agent Basset developed probable cause to detain Chavez based on the immigration "warrant." Therefore, Agent Basset did not discover Chavez's identity during an unconstitutional seizure. Because resolving the factual ambiguities in this way allows us to uphold the district court's denial of Chavez's motion to suppress, we reject Chavez's contrary interpretations of the record even though they might also be reasonable.[7] See Broomfield, 201 F.3d at 1273.

---

[7] Because the record supports the conclusion that the encounter remained

Continued . . .

## A.    Retention of Chavez's Bus Ticket

If, as the Government urges, Agent Basset returned Chavez's bus ticket immediately after questioning Chavez about his luggage and checking the ticket for luggage receipts, then Agent Basset's brief retention of Chavez's ticket, without more, did not transform the consensual encounter into a seizure.  See United States v. Boone, 67 F.3d 76, 79 (5th Cir. 1995) (holding that the defendant was not seized where officers at a bus station held the defendant's ticket while asking him a series of questions, many of which concerned information from the ticket); United States v. Soto-Lopez, 995 F.2d 694, 698 (7th Cir. 1993) (holding that the defendant was not seized where one officer read information from the defendant's airline ticket and another officer took notes; observing that the officers immediately returned the ticket after examination and did not retain the ticket for an "unusual length of time"); cf. United States v. Lambert, 46 F.3d 1064, 1068 & n.3 (10th Cir. 1995) (explaining that police officers' retention of the defendant's driver's license became improper only after the officers were able to accomplish their purpose in requesting the license, namely, to verify the defendant's identity).  Two portions of the transcript of the hearing on the motion to suppress support the Government's account of when Agent Basset returned the ticket.

---

consensual until after Agent Basset discovered the immigration "warrant," we do not reach the question whether the district court correctly determined that Agent Basset had justification to detain Chavez earlier in the encounter.  We also express no opinion on whether there might be other reasonable views of the evidence that would allow us to affirm the district court's ruling.

First, the prosecutor asked Agent Basset on direct examination if he returned Chavez's ticket after examining it. Agent Basset responded, "Yes, ma'am, I did." (ROA, vol. III at 29.) Second, the prosecutor asked Agent Basset if he had "any prolonged retention of [Chavez's] personal effects like the passport or the ticket." Agent Basset answered, "No. I do encounters on a daily basis, and when I review something, I'll hand it right back to them." (Id. at 31.)

Despite this testimony, Chavez argues that the record shows that Agent Basset retained the ticket until after he searched Chavez's bag. Chavez relies on two other portions of Agent Basset's testimony to reach this conclusion.

First, on direct examination, after Agent Basset testified to discovering the wine in Chavez's bag, the prosecutor asked Agent Basset why he was suspicious that Chavez might be engaged in some kind of criminal activity. Agent Basset stated that he became increasingly concerned when Chavez told him that the wine was not the reason he was acting nervous. The prosecutor then asked if Agent Basset was suspicious because Chavez claimed that he was moving to the East Coast with only one small bag and because of Chavez's "sort of unusual ability to converse." (Id. at 23.) Agent Basset responded that those factors raised his awareness level, but, in addition, Chavez's hand was shaking when Agent Basset took his ticket and Chavez did not appear comfortable when Agent Basset returned the ticket.

Apparently, Chavez believes that because Agent Basset testified to Chavez's nervousness upon the return of the ticket after he testified to Chavez's nervousness upon

12

the discovery of the wine, Agent Basset necessarily returned the ticket after searching Chavez's bag and finding the wine. (See Aplt. R. Br., at 4 ("In context, by talking of returning the ticket at the end of a sequence of events following his questioning of Mr. Chavez about the trip and his searching of Mr. Chavez'[s] bag, [Agent Basset] confirms . . . that he returned the ticket after the questioning [of] Mr. Chavez and searching his bag.").) Chavez's interpretation of this portion of the testimony is not implausible; however, there is another interpretation that is at least equally (and probably more) plausible.

One could read the portion of Agent Basset's testimony discussed above and conclude that Agent Basset was not listing the circumstances that made him suspicious in any sort of temporal order. Rather, he was just responding to the prosecutor's questions, and the flow of the questioning guided Agent Basset's responses rather than the precise sequence of events. In our view, this represents a logical interpretation of Agent Basset's testimony, especially given that Agent Basset also mentioned taking Chavez's ticket after he mentioned Chavez's nervousness upon the discovery of the wine. It is undisputed that Agent Basset took Chavez's ticket before he searched Chavez's bag and found the wine, so reading this portion of the testimony as Chavez suggests—i.e., as if Agent Basset were recounting all of the events in the precise order in which they happened—leads to an absurd conclusion that cannot be squared with a part of the record that is clear.

Second, Chavez relies heavily on a statement made by Agent Basset when defense counsel was cross-examining him about his suspicion of criminal activity:

13

> At a point when I was speaking with him and I asked him did he have any luggage, I looked at his ticket to see if he had any luggage tickets. He did not. I gave it back to him. I asked him about the red wine. He stated that that's not why he was nervous. I then called EPIC, and there was some form of warrant for him.
>
> It was at the time that I was calling EPIC, I was thinking: Does this guy have a warrant? Is he running from something? At that point, that's when that thought process starting crossing my mind because . . . I didn't believe it was drug-related and I didn't believe it was the alcohol that was making him nervous.
>
> At that point, I didn't know why, and that was the next logical step for me, to think that maybe he was running from something.

(ROA, vol. III at 51 (emphasis added).) Chavez argues that "[b]ecause [Agent Basset] asked about the red wine just after handing back the ticket, it is clear that [Agent Basset] had the ticket while searching the bag; otherwise, he would not have known about the wine to ask about it." (Aplt. Br., at 18–19.) Again, Chavez's interpretation is not implausible, but it is not the only reasonable interpretation.

In concluding that Agent Basset "asked about the red wine just after handing back the ticket," Chavez implicitly interprets Agent Basset's testimony as meticulously recounting an exhaustive sequence of events. In our view, however, it is just as reasonable to infer that although Agent Basset was testifying about events in a temporal order, he was not listing everything that happened during the encounter. Because Agent Basset was asked only about why he suspected Chavez of criminal activity, it seems likely that Agent Basset would mention only the events that led to his suspicion—i.e., his discovery that Chavez was moving to the East Coast with only one bag and Chavez's nervousness after the discovery of the wine. Thus, while the above testimony indicates

14

that Agent Basset asked about the red wine <u>at some point</u> after returning the ticket, the testimony does not necessarily suggest that he did so <u>immediately</u> after handing back the ticket.

Ultimately, we need not decide which interpretation of Agent Basset's testimony regarding the return of the ticket is more reasonable. Rather, we simply need to determine whether the testimony can reasonably be construed to support the view that Agent Basset returned the ticket after questioning Chavez about his luggage but before searching Chavez's bag. <u>See</u> <u>Broomfield</u>, 201 F.3d at 1273. For the reasons explained above, we conclude that it can.

**B.    Timing of the Pat-Down Search**

When Agent Basset performed a nonconsensual pat-down of Chavez's person, the encounter likely became a seizure. <u>See</u> <u>United States v. Crandell</u>, 554 F.3d 79, 88 n.7 (3d Cir. 2009) ("An officer must place his hands on an individual to conduct a pat-down search, which leads logically to the contention that this act constitutes a seizure."); <u>United States v. Davis</u>, 202 F.3d 1060, 1062 (8th Cir. 2000) ("<u>Terry</u> leaves no doubt that a pat-down search is a seizure."). Chavez contends that Agent Basset actually conducted two pat-downs, one after discovering the wine and one after learning of the "warrant" from EPIC. According to Chavez, because the first pat-down occurred right before Agent Basset asked for his identification, Chavez was detained at the time he handed over his passport.

15

The transcript of the hearing on the motion to suppress contains very little testimony regarding the pat-down issue. In fact, the subject of the pat-down came up only briefly during defense counsel's cross-examination of Agent Basset. Defense counsel initially asked Agent Basset if he conducted a pat-down of Chavez. Agent Basset responded, "Yes, sir, I believe I did." (ROA, vol. III at 37.) Later, defense counsel asked Agent Basset when he performed the pat-down. Agent Basset said, "I did the pat-down after I was informed by EPIC that there was some form of warrant and after [Chavez] told me that the red wine was not the reason that he was upset or was nervous." (Id. at 41 (emphasis added).) Chavez reads this language as unequivocally indicating that Agent Basset conducted two pat-downs. In other words, Chavez construes the word "and" as suggesting that a separate pat-down occurred after the discovery of the red wine and after Agent Basset spoke with EPIC.

We believe that Agent Basset's testimony can be interpreted in a different way that is arguably more natural and consistent with ordinary understandings of syntax. Specifically, one could read Agent Basset's testimony to indicate that Agent Basset performed one pat-down and that he did so after both of the events mentioned. This interpretation finds support in Agent's Basset's opening phrase: "I did the pat-down . . . ." The use of the word "the" followed by the word "pat-down" in the singular form implies that Agent Basset conducted only one pat-down.

In any event, we need not evaluate the relative reasonableness of the competing interpretations of Agent Basset's testimony. One reasonable view of the evidence is that

16

Agent Basset conducted a single pat-down after learning about the "warrant" from EPIC. That interpretation allows us to conclude that the encounter remained consensual until Agent Basset acquired probable cause to detain Chavez, which in turn leads to the conclusion that the district court correctly determined that Agent Basset did not learn Chavez's identity as a result of an unlawful seizure. For purposes of this appeal, we need go no further. See Broomfield, 201 F.3d at 1273.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Chavez's motion to suppress.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

17